ERNEST B. MURPHY *vs*. BOSTON HERALD, INC., & another.[1]

Suffolk. February 8, 2007. - May 7, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Libel and Slander. Constitutional Law,* Libel and slander, Freedom of speech
and press. *Judge. Malice. Damages,* Libel. *Evidence,* State of mind.

Discussion of the limits set by the First Amendment to the United States
Constitution on the application of defamation law with respect to any
factual statement published in the news media about a public official or
public figure, even when that statement is shown to be false and
defamatory. [48-50]

In a defamation case brought by the plaintiff, a judge of the Superior Court,
against the defendants, a newspaper and a reporter, there was overwhelm-
ing evidence (including the complete discrediting of a key witness and the
affirmative testimony of percipient witnesses indicating that words spoken
by the plaintiff were not as quoted by the reporter) from which to conclude,
as the jury did, that the statements at issue were defamatory and false
[50-57]; further, the evidence (which demonstrated the reporter's purpose-
ful failure to investigate known witnesses and the questionable circum-
stances in which the reporter destroyed his notes) clearly and convincingly
supported the jury's determination that the defendants published the state-
ments with actual malice, that is, with knowledge of their falsity or with
serious doubts as to their truth [57-64]; moreover, the evidence decisively
demonstrated that the reporter, in commenting on a television show about
the statements in question, possessed either a brazen disregard for the
actual truth or a deliberate intent to give credence to a controversial story
that he knew at the time to be false [64-65].

In a defamation case brought against a newspaper and a reporter concerning
the newspaper's publication of defamatory articles written both by the
defendant reporter and by other reporters at the newspaper, there was no
merit to the defendants' argument that the plaintiff could not recover dam-
ages for any libelous statements therein without proof of actual malice as
to each reporter. [65-66]

In assessing damages in a defamation action brought against media defendants,
the judge properly permitted the jury to consider hate mail received by the
plaintiff that explicitly referred to the articles in question [66]; further, the
jury could properly consider (and the judge properly instructed them on
their use of) certain testimony about the emotional impact on the plaintiff
of being made the target of public disgrace by the defendants [66-67] and
the emotional distress suffered by the plaintiff as a result of watching his

[1]David Wedge, a reporter for the Boston Herald, Inc.

daughter's acute emotional trauma in the wake of the publication of the articles [67-68]; moreover, the judge's decision to admit expert testimony concerning the nature of generally accepted journalistic standards was within his discretion [68-69].

In a defamation action brought against a newspaper and one of its reporters, there was no merit to the newspaper's argument that it could not be held liable for statements made by the reporter on a television show about the defamatory articles published in the newspaper, where the reporter was acting within the scope of his employment at all times relevant to the case and appeared on the television show with the approval, and encouragement, of his editors. [69]

In a defamation action brought by the plaintiff, a judge of the Superior Court, against the defendants, a newspaper and a reporter, any impropriety connected to two letters sent by the plaintiff to the newspaper after the verdict could not possibly have so tainted the trial as to require that the judgment be vacated and the complaint be dismissed. [69]

CIVIL ACTION commenced in the Superior Court Department on June 3, 2002.

The case was tried before *Charles R. Johnson*, J., sitting under statutory authority.

The Supreme Judicial Court granted an application for direct appellate review.

*Bruce W. Sanford*, of the District of Columbia (*Bruce D. Brown*, of the District of Columbia, & *Jeffrey P. Hermes* with him) for the defendants.

*Michael Avery* (*Howard M. Cooper* with him) for the plaintiff.

*Jonathan M. Albano & Carol E. Head*, for The Associated Press & others, amici curiae, submitted a brief.

GREANEY, J. We have before us on direct appellate review the special verdict of a jury in the Superior Court in a defamation case brought by the plaintiff, a judge of the Superior Court, against the defendants, the Boston Herald, Inc., and its reporter, David Wedge. The jury found that the defendants published a series of false statements about the plaintiff that held him up to public disgrace and contempt, and, further, that they published the statements either with actual knowledge that the statements were false, or with a high degree of awareness of their probable falsity. We conclude that the verdict, as modified by the trial judge, holding the defendants liable for the calumnies published, is sound in fact and in law, and we now affirm the judgment entered on the jury's verdict.

We summarize the undisputed facts necessary to set the general context of this appeal, reserving certain details essential to the disposition for discussion of the relevant issues. On February 13, 2002, the Herald published the first in a series of articles attacking the plaintiff's perceived "softness on crime." The front-page article, authored by the defendant David Wedge and another reporter, Jules Crittenden, ran under the headline "Murphy's law." The article was subtitled "Lenient judge frees dangerous criminals," and included a photograph of the plaintiff with a caption describing him as "Under fire." The article began as follows:

> "A wrist-slapping New Bedford Superior Court judge under fire for letting four accused rapists return to the streets in the past week has a pro-defendant stance and has heartlessly demeaned victims, according to records and sources.

> "According to several courthouse sources, Judge Ernest B. Murphy said of a teenage rape victim, 'She can't go through life as a victim. She's [fourteen]. She got raped. Tell her to get over it.'

> "The exchange occurred in Murphy's New Bedford Superior Court chambers last week when prosecutors confronted Murphy over his lenient sentencing practices. He also belittled a [seventy-nine] year old robbery victim when prosecutors pushed for a tough jail term for her attackers, reportedly saying, 'I don't care if she's [one hundred and nine],' sources said."

The article characterized the plaintiff as a "career civil attorney now sitting as a judge on criminal cases, [who] has come under heavy scrutiny from prosecutors and police for doling out probation to violent offenders and allowing accused rapists to walk out of court on bail." Paul F. Walsh, Jr., district attorney for the Bristol district, was quoted as saying, "He sees the courts as a social service agency to help defendants. All his compassion goes to the defendants and not the victims and that's not justice." The article listed specific instances where the plaintiff allegedly favored violent criminals over victims, to

the outrage of victims' families and law enforcement. Walsh was quoted as saying, "I rue the day when one of these people comes back and hurts someone again. It's going to happen."

The next day the Herald ran a second article by Wedge about the plaintiff, this one entitled, "Rape victim's mom pleads . . . Dump the judge." The article began, "A criminal-coddling judge who has let four accused rapists walk out of court in the past week should be removed by acting Gov. Jane Swift, the enraged mother of one of the rape victims said yesterday." The article described how the young victim "took the stand and tearfully told the judge how the rape has affected her," and reported that the plaintiff sentenced the defendant to probation for eight years, "[d]espite the teen's heart-wrenching testimony." The article, which included a photograph of the "enraged mother," continued, "According to courthouse sources, Murphy made a heartless comment about [her] daughter to a prosecutor behind closed doors just days after the lenient sentence. 'She can't go through life as a victim. She's [fourteen]. She got raped. Tell her to get over it,' sources quoted the judge as saying."

The articles of February 13 and 14 were followed by other Herald articles sharply critical of the plaintiff, which contained sweeping allegations of his incompetence to sit on criminal cases, his bias toward defendants, and his open hostility to victims and prosecutors. The majority of articles repeated the statement first attributed to the plaintiff by Wedge on February 13, "She's [fourteen]. She got raped. Tell her to get over it," and those words drew national attention. On March 7, with the approval and encouragement of his editors, Wedge appeared as a guest on the televised talk show, "The O'Reilly Factor." When the show's host asked Wedge, "Are you absolutely one hundred per cent sure that Judge Murphy said that the rape victim should get over it?," Wedge responded, "Yes, he said this. He made this comment to three lawyers. He knows he said it, and everybody else that knows this judge knows that he said it."

The Herald's publications devastated the plaintiff. Once a proud, gregarious man, he became diminished, scared, and sad. The plaintiff's physician described the plaintiff as psychologi-

cally "devastated and broken." Diagnosed with severe posttrau-matic stress syndrome, the plaintiff suffered from duodenal ulcer disease and irritable bowel syndrome and was required to undergo multiple invasive endoscopic procedures. There was evidence that his reputation in the legal community and col-legial relationships with colleagues deteriorated to the point where he felt "radioactive."

The plaintiff filed a complaint in the Superior Court in June, 2002, alleging that the stories were false, that they had damaged his reputation and caused other injuries, and that they had been published with actual malice.[2] The case was tried over a twenty-day period in January and February, 2005. The jury were given a twenty-two page special jury questionnaire, which properly defined the requirements of defamation involving a public of-ficial, and asked whether the plaintiff had proved all of the required elements of his claim on each of sixty-one statements appearing in seventeen exhibits.[3] The questionnaire also asked the jury to determine the amount of damages (if any) to which the plaintiff was entitled, on each of the libelous statements, in accordance with the judge's instructions on damages. The jury found the defendants liable on twenty-two counts of defamation and awarded the plaintiff compensatory damages in the sum of $2.09 million.[4]

The defendants filed a motion for judgment notwithstanding

[2] In addition to the defendants, the plaintiff's complaint named Jules Crit-tenden, Margery Eagan, and David Weber. At the close of the evidence, the trial judge entered judgment in favor of Eagan and Weber pursuant to Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974). The jury returned their special verdict finding Crittenden not liable. None of the three is involved in this appeal.

[3] We note at this point the value of the special jury questionnaire. The questionnaire, which formed the basis for the jury's verdict, allows us to track the jury's reasoning process. If it became necessary, the questionnaire would also allow us to preserve the verdict if we concluded that some of the state-ments the jury found actionable were not in law libelous. (We do not make that conclusion here.) The questionnaire is an example of a well-managed trial, for which the judge deserves special acknowledgment, in view of the complexity of the issues involved.

[4] The special jury questionnaire presented the jury with sixty-one statements claimed by the plaintiff to be libelous. The jury found that the plaintiff had failed to meet his burden of proof on each of thirty-eight statements and were deadlocked on one. This discloses the careful attention paid to the evidence by the jury and demonstrates the jury's keen ability to discriminate between actionable and nonactionable statements.

the verdict, pursuant to Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998), or, in the alternative, for a new trial, pursuant to Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974), and for remittitur. The judge[5] upheld the bulk of the verdict, but concluded that three of the statements for which the jury found the defendants liable qualified as protected statements. The judge denied the defendants' motion in part, and allowed it in part, which had the effect of reducing the damages award to $2.01 million.

The defendants challenge their liability with respect to the remaining nineteen statements, which may be grouped into five categories as follows.

(a) The plaintiff stated "She can't go through life as a victim. She's [fourteen]. She got raped. Tell her to get over it."[6]

(b) "The exchange occurred in [the plaintiff's] New Bedford Superior Court chambers last week when prosecutors confronted [him] over his lenient sentencing practices."

(c) The plaintiff "heartlessly demeaned victims."[7]

(d) "The victim [in the rape case] took the stand and tearfully told the judge how the rape has affected her."

(e) "[The plaintiff] said this — he made this comment to three lawyers. He knows he said it, and everybody else that knows this judge knows that he said it."

[5]The Chief Justice of the Boston Municipal Court Department presided over the trial pursuant to a special assignment by the Chief Justice for Administration and Management of the Trial Court.

[6]The jury found the defendants liable for this statement as it appeared in the article authored by Wedge on February 13, 2002, as well as for nine repetitions of the statement (or variations thereof) published in the Herald thereafter. Eight of the articles repeating the original statement were authored by reporters other than Wedge.

[7]Similar statements published by the Herald, for which the jury found the defendants liable, asserted that the plaintiff "has a history of . . . vilifying victims"; that the plaintiff "made a heartless comment about [the victim] to a prosecutor behind closed doors just days after the lenient sentence"; and that the plaintiff "chastised the young girl for wanting a harsher sentence on her attacker."

The defendants contend on appeal that the jury's verdict and award of damages are "incongruent with controlling authority under the First Amendment." Their arguments focus primarily on the sufficiency of evidence to support the jury's determinations that the above statements were false and meet the constitutional standard for a determination of "actual malice." They also challenge the judge's instructions on the doctrine of "republication" and assert errors in miscellaneous evidentiary rulings made by the judge with respect to damages. Finally, the defendants argue that two letters sent by the plaintiff to the Herald after the verdict, one on court stationery, were so inappropriate as to require that the judgment be vacated and the plaintiff's complaint be dismissed. We address each claim in turn.

1. a. The First Amendment to the United States Constitution sets clear limits on the application of defamation law with respect to any factual statement published in the news media about a public official or public figure,[8] even when that statement is shown to be false and defamatory. In *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-280 (1964), the United States Supreme Court held that, in such cases, the First Amendment requires that the plaintiff must prove, by clear and convincing evidence, that the defendant published the false and defamatory material with " 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." See *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 719 (1987), cert. denied, 485 U.S. 962 (1988); *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849, 867 (1975). Subsequent decisions by the Supreme Court have established that a finding of "reckless disregard" requires proof, not of mere negligence, but that the author "in fact entertained serious doubts as to the truth of his publication." *St. Amant* v. *Thompson*, 390 U.S. 727, 730-731 (1968). See *Bose Corp.* v. *Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984), and cases cited. See also *McAvoy* v. *Shufrin*, 401 Mass. 593, 598-599 (1988); *King* v. *Globe Newspaper Co., supra* at 720; *Stone* v. *Essex County Newspapers, Inc., supra.* Exactly how much evidence is sufficient, as matter of constitutional law, to establish actual malice

[8]The plaintiff is, indisputably, a public official.

is determined on a case-by-case basis. When two opposing versions of occurrences exist, the jury's conclusion to disbelieve the defendant's version is not enough to establish actual malice. See *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657, 692-693 (1989). Further, the fact that journalistic standards were not met, or that a reasonably prudent person would have investigated further, will not be sufficient to show actual malice. See *St. Amant* v. *Thompson, supra* at 731. "[A] public figure plaintiff must prove more than an extreme departure from professional standards." *Harte-Hanks Communications, Inc.* v. *Connaughton, supra* at 665. When a reporter is aware of an allegation's probable inaccuracy, however, a deliberate intent to avoid the truth may be adequate to establish actual malice. See *id.* at 692; *St. Amant* v. *Thompson, supra* at 731-732. When reporting allegations of a third party, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his report." *Id.* at 732. A defendant cannot ensure a "favorable verdict by testifying that he published with a belief that the statements were true." *Id.* See *Milgroom* v. *News Group Boston, Inc.*, 412 Mass. 9, 11 (1992). As a baseline proposition, the reviewing court must examine the content of the statements, and the circumstances under which they were made, to see "whether they are of a character which the principles of the First Amendment . . . protect." *New York Times Co.* v. *Sullivan, supra* at 285.

Because First Amendment values are at stake, Federal constitutional law also requires the reviewing court to conduct an independent examination of a jury verdict favorable to the plaintiff, to determine whether the evidence in the record is sufficient to support a determination of "actual malice." See *Bose Corp.* v. *Consumers Union of U.S., Inc., supra* at 499-501, 508-509 n.27; *McAvoy* v. *Shufrin, supra* at 596-597. The purpose of this examination is to ensure that the jury's finding of "actual malice" is not "predicated on a misunderstanding of the governing rule of law." *Bose Corp.* v. *Consumers Union of U.S., Inc., supra* at 501. A court must review those parts of the record which relate to the jury's finding of "actual malice," for each defamatory statement, to determine whether the record establishes actual malice with convincing clarity. See *id.* at 514 & n.31; *King* v. *Globe Newspaper Co., supra*.

The question whether the evidence is sufficient to support a finding of actual malice is one of constitutional law. See *Harte-Hanks Communications, Inc.* v. *Connaughton, supra* at 685-686. It is clear, however, that a reviewing court cannot observe the demeanor of witnesses and, therefore, is not equipped to answer questions of credibility. The constitutionally required independent examination therefore takes place when, after compiling all of the facts implicitly established by the jury's verdict, the court considers whether that body of facts, clearly and convincingly, supports a determination of actual malice. See *id.* at 689-690; *Mandel* v. *Boston Phoenix, Inc.*, 456 F.3d 198, 208 (1st Cir. 2006) ("Purely factual determinations [such as credibility calls] remain subject to the usual degree of deference"). Although the independent examination is not "de novo" in the literal sense, see *Bose Corp.* v. *Consumers Union of U.S., Inc., supra* at 514 n.31, core First Amendment values require a searching reassessment of the factual record in full, to ensure that all inferences underlying the jury's ultimate determinations are legitimate and provide clear and convincing evidence of actual malice. See *Harte-Hanks Communications, Inc.* v. *Connaughton, supra*; *Newton* v. *National Broadcasting Co.*, 930 F.2d 662, 670-671 & nn. 12, 13 (9th Cir. 1990). Guided by these principles, we now turn to our analysis of the challenged statements.

b. As an initial matter, we conclude that there is overwhelming evidence in the record from which to conclude, as the jury did, that the statements were defamatory[9] and false. The question of falsity, or substantial falsity, remains one of tort law, and minor inaccuracies will not constitute falsity if the substance of the alleged libelous matter is true. See *Milgroom* v. *News Group Boston, Inc., supra* at 12-13; *Thompson* v. *Boston Publ. Co.,*

---

[9]The defamatory nature of each statement requires little discussion. In his writings, Joseph Story, Associate Justice of the Supreme Court of the United States from 1811 to 1845, and the first Dane Professor of Law at Harvard University, said the following: "To say, that, as a judge, he was wise, impartial, and honest, is but to attribute to him those qualifications, without which the honors of the bench are but the means of public disgrace, or contempt." Miscellaneous Writings of Joseph Story 809-810 (W.W. Story ed. 1852). Phrased differently, if less eloquently, to charge that a judge is biased or unfair, or otherwise cannot be trusted to administer justice according to the law, is to strip away the qualities for which the office is respected and held to be legitimate.

285 Mass. 344, 349 (1934); 1 R.D. Sack, Libel, Slander, and Related Problems § 2.4.18 (3d ed. 2006). In cases, as here, involving matters of public concern published by a media defendant, the burden is on the plaintiff to prove falsity. See *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 775 (1986); *Friedman* v. *Boston Broadcasters, Inc.*, 402 Mass. 376, 381 (1988).[10] The defendants' challenge to the jury's determination on this issue is subject to our traditional standard of review of any jury's finding of fact, that is, whether the finding has a basis in the evidence and reasonable inferences that could be drawn therefrom. The defendants present no persuasive argument as to why the jury's clear determination in this regard, for each of the five categories of statements determined to be libelous, is not reasonable and amply supported by the evidence.

Wedge, called as a witness for the plaintiff, testified as follows. One or two weeks before writing the February 13 article, he became aware of some controversy over the plaintiff's sentencing rulings, and, after discussing the matter with his editors at the Herald, was assigned to investigate growing public criticism of the plaintiff. In conversations with Gerald FitzGerald, assistant district attorney and chief trial counsel for the Bristol district, Wedge was informed that the plaintiff had made certain comments to prosecutors about two crime victims. The first was made concerning a seventy-nine year old robbery victim during a lobby conference in the case. According to FitzGerald, the plaintiff refused to sentence the defendants to jail time, and, to the prosecutor's insistence that the victim's age should be considered an aggravating factor, responded, "I

---

[10]The judge properly instructed the jury:

"The mere fact that someone has made a defamatory statement about another does not render it legally wrong. No matter how defamatory a statement may be; no matter what the defendant's motive in writing it, if [the plaintiff] has failed to prove by a preponderance of the evidence that the statement is false; that is, that it's not substantially true, [the plaintiff] cannot prevail on his claim. [The plaintiff] must prove more than literal falsity; he must prove the falsity of the substance of the statement at issue, where the main charge or stem of the statement is true, minor errors that do not change the readers' understanding of its words, do not make the statement false. In other words, sliding accuracies do not make a statement false."

don't care if she's [one hundred and nine]."[11] The second, which FitzGerald indicated was made about a fourteen year old rape victim, was the "tell her to get over it" statement. Wedge wrote FitzGerald's words down in a notebook. Wedge then spoke to Paul Walsh, the district attorney, who repeated the statements to Wedge. Wedge understood that Walsh and FitzGerald had not been present when the statement regarding the rape victim was (allegedly) made, and asked Walsh for the name of the prosecutor who had reported hearing the plaintiff say the words. Walsh told Wedge that he preferred to keep the identity of the prosecutor, a young assistant district attorney, confidential. However, Walsh arranged a meeting between Wedge and the prosecutor, David Crowley, to whom FitzGerald said the statements had been made. According to Wedge, this meeting took place before February 13 in FitzGerald's office, and, at the meeting, Crowley confirmed to Wedge that Walsh had correctly characterized the statements. Wedge read from his notebook the quotations that would appear in the Herald, and Crowley did not indicate that any of the information was inaccurate. Wedge next went to the New Bedford court house to interview the plaintiff, but there was turned away by a clerk, who told him that he would not be able to speak with the plaintiff. Wedge asked a court officer whether it would be possible for him to deliver a note to the plaintiff, but was told no. On the afternoon of the day the story ran, Wedge sought out the plaintiff at a restaurant near the court house, in order to provide him with an opportunity to respond to the "charges in the newspaper." The plaintiff declined to do so, however, telling Wedge that he was prohibited from discussing pending cases.[12] Wedge discarded the notebook in which he had recorded the

---

[11]The evidence at trial indicated that, during a discussion of what the sentence should be for the two defendants charged with armed robbery, the prosecutor mentioned the victim's age. According to testimony of a probation officer who was present at the lobby conference, the plaintiff commented that it "didn't matter if she was twenty-nine, seventy-nine, or one hundred and nine, it was a serious case and [the plaintiff] felt some jail time was — was indicated." One of the defense lawyers and the clerk characterized the remark in similar fashion, as did the plaintiff. The defendants each were sentenced to two and one-half years in a house of correction. Ultimately, the jury deadlocked and did not find this statement to be libelous.

[12]Wedge further testified that, as the plaintiff walked away, Wedge "shouted a couple other questions at him, one of them along the lines of, 'Did he have

plaintiff's statements, as told him by Walsh, FitzGerald, and Crowley, sometime after the February 13 story ran. This then was Wedge's side of the case.

Wedge, however, was thoroughly and convincingly impeached by his own deposition testimony, taken in July and August, 2002. At his deposition, Wedge contradicted his trial testimony in every material respect. For example, Wedge testified at his deposition that he did not meet with Crowley, and thus did not confirm the accuracy of the alleged statement with any percipient witness, until *after* the statement had been published in the February 13 article. Moreover, Wedge conceded that his sources for the statement (FitzGerald, Walsh, and Crowley) related the statement using slightly different words, and that, instead of "tell her to get over it," the words told him may have been, "she's got to get over it." At one point in his deposition, Wedge testified that all three of his sources had told him that the plaintiff had said, "She's a [fourteen year old] girl, she got raped, she's got to get on with her life and get over it." He admitted that FitzGerald originally had told him that the plaintiff had said the words after the sentencing hearing in the rape case. By the time the February 13 article appeared, Wedge testified at his deposition, his information as to when the words had been spoken had changed. Wedge also admitted, in his deposition testimony, that he had no source at all for the report that the words had been spoken when prosecutors had "confronted" the plaintiff over his lenient sentencing practices. According to Wedge, the confrontation context may have been a fabrication. When asked to describe the court officer at the court house who had (as Wedge testified) barred his access to the plaintiff on February 12, Wedge was unable to provide any details. Wedge admitted, in deposition testimony, that he did not know the location, in the court house, of the court room in which the plaintiff was sitting that day, and admitted, essentially, that there had been no note. In the end, Wedge also was unable to identify any source for his reported statements that the plaintiff "heartlessly demeaned victims." Finally, Wedge conceded that the statement in the February 14 article reporting that the rape

anything to say to his victims, or to the victims?,' " but that the plaintiff did not respond.

victim "took the stand and tearfully told the [plaintiff] how the rape had affected her" was false. Indeed, in a different article appearing in the Herald on February 14, directly alongside Wedge's article, it was correctly reported that a prosecutor had read the victim's impact statement in court. Neither Wedge, nor any other Herald employee who testified at trial, could name one person at the Herald who either edited, or checked for accuracy of, the content of Wedge's articles. It is fair to say that, by the end of Wedge's testimony, his credibility on any material factual point at issue was in tatters.

In direct contrast to Wedge's testimony, five of the six participants in the lobby conference for the robbery case (including the plaintiff) denied that anything had been said about the rape victim in that setting. Crowley, the only participant who attested otherwise, testified, on direct examination, that the plaintiff had said, in a conversational tone, words to the effect of, "You can't go through life as a victim. You're [fourteen]; you've been raped. Get over it," and, on cross-examination, agreed that the plaintiff's words may have been "she needs to get over it" or "she has to get over it." He testified forcefully that the plaintiff had not stated the words, "Tell her to get over it" and denied that he had ever told anyone that the plaintiff had done so. When Crowley saw the February 13 Herald article he was "surprised" and "concerned" because he did not know where the "tell her to get over it" quote originated. He testified that it was not accurate. Crowley agreed that he had testified, at his deposition, that if Wedge had asked him to confirm that the plaintiff had used the phrase "tell her to get over it" (as Wedge had claimed), he (Crowley) would have corrected him. He also testified that he had never told Wedge that he had heard the plaintiff had demeaned or belittled the young rape victim or heartlessly demean any victim. Crowley testified that, the day after reading the February 13 article, he went to see FitzGerald (who was his superior), and told him that he was not pleased with what had been said in the article.

FitzGerald was the only witness at trial, besides Wedge, to testify that the actual words Crowley had told him, and that he and Walsh had repeated to Wedge, were "tell her to get over it." The jury's attention with respect to FitzGerald's testimony, however, was clearly focused on the probability of bias. The jury

heard evidence that FitzGerald had known the editor-in-chief of the Herald, Andrew F. Costello, Jr., for over twenty years, both professionally and socially. FitzGerald testified that his daughter had worked for the Herald from 2001 until 2004 (first as an intern, later as a reporter), and that she had obtained her job, at least in part, because of his friendship with Costello. FitzGerald had once represented one of Costello's family members in a criminal matter. As conceded by defense counsel at oral argument, determinations of credibility under the *Bose* standard remain the province of the jury. While it is impossible to know for certain exactly what credibility determinations led to the jury's verdict, it is clear that the jury did not believe FitzGerald.

Walsh testified that Crowley had come to him with a comment the plaintiff had made about a rape victim, and that he in turn had reported the comment to Wedge, but testified that he was unable to recall the exact words spoken. Walsh stated, at different times in his testimony, that the words could have been, " 'She's fourteen. She's been raped — she needs to get over it. Tell her to get over it,' " or " 'She's fourteen. She's got to get on with her life. She needs to get over it. She has to get over it,' or 'get over it.' " On cross-examination, he was impeached by his deposition testimony in which he admitted to having "[n]o specific memory of his exact words," but testified that he had told Wedge, in substance, that the plaintiff had said, "She's got to get on with her life. She's got to get over it." Walsh also testified that he never told Wedge that the plaintiff had demeaned or belittled victims and that he characterized the interaction between Crowley and the plaintiff to Wedge, and others in the media, as a "good-faith dispute." Walsh agreed with the plaintiff's counsel that it "could be true" that the quote was something that he had heard was said at an earlier lobby conference for the rape case.

None of the five participants in the earlier rape case lobby conference, however, had any recollection of any "tell her to get over it" remark being made in that setting.[13] All (including

[13]The position taken by the defendants was that the comment "tell her to get over it" was made about the fourteen year old rape victim at the lobby conference for the unrelated robbery case. As has been explained, the jury heard evidence that no such comment was made at the robbery case lobby conference, but that, at the lobby conference for the rape case, the judge had expressed his concern for the victim and the availability of counselling to help her. The

the prosecutor, David Frank) testified that the plaintiff expressed concern for the impact of the crime on the young rape victim. The plaintiff specifically inquired whether probation could assist the victim pay for counselling services or whether the defendant had the resources to pay for such counselling. The clerk testified that the plaintiff indicated that the victim should be in counselling to help her cope with her situation and to help her "put the matter behind her and get on with her life." All participants denied emphatically that there had been any sort of confrontation between the prosecutor and the plaintiff. Voices were not raised and the atmosphere was cordial.[14] Crowley was not present on that occasion.

Throughout their brief, the defendants argue, essentially, that Wedge's February 13 article correctly captured the "gist" or "tone" of the statements made by the plaintiff. The jury, obviously, concluded otherwise and their conclusion is amply supported by the evidence. This evidence included the complete discrediting of Wedge by his own statements and the affirmative testimony of percipient witnesses who indicated that the words spoken by the plaintiff were not as quoted by Wedge. The defendants assert in their brief that, "[h]aving noted that Crowley testified that the 'gist' of the 'get over it' statement was accurately reported in the Herald . . . the trial court needed to go no further." This assertion is a misstatement of the law. A statement is false, for purposes of libel, if there has been a

defendants strenuously objected at trial, as they do now on appeal, to admission of all evidence regarding the lobby conference for the rape case. According to the defendants, the evidence creates an artificial sense of "falsity" and "actual malice" for the jury and, moreover, is irrelevant. We could not disagree more. It was Wedge himself who originally testified, at his deposition, that he might have been told that the plaintiff's comments were made shortly after the plaintiff left the bench after sentencing the defendant in the rape case. Walsh's deposition testimony, which was read at trial, indicated that the substance of the quote he gave to Wedge was, "She's got to get on with her life. She's got to get over it," and Walsh testified that the statement could have been made at the lobby conference in the rape case. In his opening statements, defense counsel made several references to presentencing discussions between the judge, the prosecutor, and defense counsel in the rape case. The testimony was plainly relevant, and there was no error.

[14]Indeed, there is no evidence in the record that the plaintiff's interactions, at any time, with those in his court room, be they court officials, prosecutors, defendants, victims, or the families of victims, could be characterized in any way but respectful and professional.

"material change in the meaning conveyed by the statement." *Masson* v. *New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). This determination is one for the jury, and not for a witness, to make. See, e.g., *McAvoy* v. *Shufrin*, 401 Mass. 593, 597-598 n.4 (1988). The jury were warranted in finding that the portion of the story quoting the plaintiff as saying, "She is [fourteen]. She got raped. Tell her to get over it," would lead one to believe the judge was indifferent, and even callous, to crime victims who appeared before him, and especially demeaning to the rape victim. The difference between the statement attributed to the plaintiff in the Herald articles, and the statement that Crowley testified he told Wedge the plaintiff had made, cannot, as matter of law, be characterized as a minor discrepancy protected by the First Amendment.[15] Moreover, the actual remarks made by the plaintiff in the lobby conference in the rape case (as undoubtedly found by the jury) are polar opposites to what Wedge reported and demonstrate that the plaintiff had acted with compassion and prudent regard to assist the victim in restoring her life.

c. We now review, as charged under the *Bose* decision, those parts of the record that relate to the jury's finding of "actual malice" for each defamatory statement published by the Herald, to determine whether the evidence clearly and convincingly supports the jury's determination that the defendants published each statement either knowing that it was not true, or entertaining serious doubts that it was true. See *Bose Corp.* v. *Consumers Union of U.S., Inc.*, 466 U.S. 485, 514 & n.31 (1984). In order to uphold the jury's verdict on each count of libel, this court must be satisfied that the evidence, clearly and convincingly, supports the jury's factual determination as to Wedge's subjective state of mind, either that he actually knew the statements were false or that he had serious, unresolved doubts as to their accuracy. This determination may be made on the basis of

---

[15]If there ever was a case that demonstrates the need for lobby conferences, where cases or other court matters are discussed, to be recorded, this is the case. This litigation, with all its unfortunate consequences for those involved, might not have occurred if the critical lobby conference (that involving the robbery case) had been transcribed. We trust that the lesson learned here will be applied by trial judges to prevent unnecessary problems that often arise from unrecorded lobby conferences. See *Commonwealth* v. *Serino*, 436 Mass. 408, 412 n.2 (2002); *Commonwealth* v. *Fanelli*, 412 Mass. 497, 501 (1992).

circumstantial evidence. See *Harte-Hanks Communications, Inc.* v. *Connaughton,* 491 U.S. 657, 668 (1989); *Milgroom* v. *News Group Boston, Inc.,* 412 Mass. 9, 12-13 (1992); *McAvoy* v. *Shufrin, supra* at 599; *Stone* v. *Essex County Newspapers, Inc.,* 367 Mass. 849, 868 (1975) ("it would perhaps be rare for a defendant in such a circumstance to admit to having had serious, unresolved doubts").

Wedge's lack of candor on the witness stand strongly supports the inference that he deliberately attempted to mislead the jury. Although disbelief in Wedge's testimony alone is not sufficient to sustain a verdict for the plaintiff, we are satisfied that the evidence we discuss below would warrant a jury's finding of actual malice by clear and convincing evidence. There is an abundance of evidence that, taken cumulatively, provides clear and convincing proof that the defendants either knew that the published statements found by the jury to be libelous were untrue, or that they published them in reckless disregard of their probable falsity.

Wedge knew that Walsh and others in the district attorney's office had publicly declared their animosity toward the plaintiff. Walsh, in fact, recently had called members of the media to an office conference room and informed them that he was going to use the media to "fire a shot across the [plaintiff's] bow." Wedge had read an article that appeared in the New Bedford Standard-Times on February 9, 2002, in which Walter Shea, an assistant district attorney for the Bristol district, was quoted as calling the plaintiff the "worst person in a black robe [he had] ever seen" and Walsh was quoted as calling the plaintiff "gutless."[16] FitzGerald was quoted in the article as saying, "If he knew that [the plaintiff] was sitting on the bench, it would be enough to bring Whitey [Bulger] back home."[17] FitzGerald and Walsh both testified that they had informed the reporter

[16]The record indicates that the "gutless" comment was not made by Walsh but by Shea. The New Bedford Standard-Times printed a correction on February 10, 2002.

[17]The above quoted statements were not published and form no part of the plaintiff's defamation claim. The statements were presented to the jury as evidence indicative of the highly critical attitude prevalent in the district attorney's office with respect to the plaintiff, and provided context by which the jury could assess Wedge's subjective awareness of this attitude.

who authored the New Bedford Standard-Times article about the statement the plaintiff had purportedly made about the rape victim. When the New Bedford Standard-Times did not print the statement, Walsh repeated it to Wedge.[18]

The evidence pointed to a distinct probability that Wedge did not speak with Crowley, the only person who reported hearing the statement, until after the February 13 article had appeared. Both Wedge (at deposition) and Walsh (at trial) gave testimony indicating that Wedge did not learn of Crowley's identity (and, thus, presumably could not have spoken with him) until after the publication of the February 13 article. Walsh testified that he, at first, had not told Wedge the name of the prosecutor who reported hearing the remark and had stated to Wedge, "right now, it's between [the plaintiff] and me." Assuming, however, that the jury believed that Wedge had met with Crowley before the February 13 article was published, it is certain that the jury found (and our independent review of the evidence leads us to the same determination) that Crowley never told Wedge that he had heard the plaintiff say, "Tell her to get over it." This finding is supported by the jury's obvious disbelief of FitzGerald, whom they likely found to be a biased witness, and of Wedge, whose testimony was discredited at every turn. The conclusion follows, inescapably, that Wedge knew that he had no percipient source for his report of the words attributed to the plaintiff. The evidence also supports the conclusion, as we next explain, that Wedge knew that the words "tell her" had, in fact, never been said.

Wedge admitted that he considered the plaintiff's words, as reported in his story and as, he insisted at trial, they were told him by FitzGerald, Walsh, and Crowley, to be "outrageous." See *St. Amant* v. *Thompson*, 390 U.S. 727, 732 (1968) ("recklessness may be found when there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports"); *Lyons* v. *New Mass Media, Inc.*, 390 Mass. 51, 57 (1983) ("A major basis for inferring actual malice involves

---

[18]Although not instrumental to our analysis, we note that the jury reasonably could have inferred that the first reporter's failure to incorporate the judge's alleged statement into the February 9 article in the New Bedford Standard-Times was due to an inability to verify its accuracy.

examination of the sources used by the reporter . . ."). Wedge also admitted that FitzGerald, on whom he had relied for information many times in the past, had never before withheld from him the name of a source. Despite obvious reasons to doubt the quotation's accuracy, however, and although Wedge knew that there were others — not connected to the district attorney's office — who had been present at the robbery case lobby conference at which the statements purportedly were made, Wedge failed to interview anyone other than Crowley. Wedge and FitzGerald both testified that Crowley gave Wedge the names of the two defense lawyers who purportedly were present at the time the statements were made, but Wedge, admittedly, did not speak with them at any time. Neither did he seek to speak with the probation officer or the clerk who had been present. When substantial doubts have been raised as to the veracity of a reporter's information, the purposeful failure to investigate known witnesses may be proof of actual malice. See *Harte-Hanks Communications, Inc.* v. *Connaughton, supra* at 692-693; *St. Amant* v. *Thompson, supra* at 731-732. The evidence, clearly and convincingly, supports the inference that Wedge included the "tell her" quotation, which not one percipient witness had confirmed, to convey the impression (false) of callousness. The evidence equally clearly and convincingly supports the determination that Wedge purposely did not seek to interview any of the percipient witnesses who would have contradicted the alleged facts in his article.[19] See *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 721-722 (1987).

Perhaps most damaging to his protestations of good faith are

---

[19]The defendants in their brief argue that evidence, presented to the jury solely through Wedge's testimony, indicates that Wedge sought out the plaintiff at the New Bedford court house on the day before the publication of his February 13 article, but that he was turned away by a clerk and a court officer (neither one of whom Wedge could identify or even describe). Wedge recounted this incident in his article as follows: "[The plaintiff] declined comment yesterday at New Bedford Superior Court." The jury determined this report to be libelous, but the judge, ruling on the defendants' motion for judgment notwithstanding the verdict, concluded that the reported statement could not, as a matter of law, reasonably be understood to be defamatory. Although the judge vacated the jury's determination on this matter, it may conclusively be inferred that the jury either did not credit, or did not find meaningful, Wedge's professed attempts to ascertain the accuracy of the quotation in his article.

the circumstances in which Wedge discarded the notebook in which he claims to have written the information as it was told to him by FitzGerald and Walsh. Although he testified that he usually discarded notes for articles "within a matter of days or [a] week" after publication, it is highly improbable that he would do so, as a routine matter, in this instance. The jury heard testimony that, on February 15, 2002, two days after the first article appeared, the plaintiff's attorney, J. Owen Todd, had personally informed Wedge that "the statements that you have quoted [the plaintiff] as making, he didn't make those statements. You have misquoted him."[20] When questioned, Wedge could not say when, or where, he discarded the notebook, just that it was sometime "after the story ran." The jury were entitled to draw the negative inference that Wedge discarded his notebook in a deliberate effort to conceal what he knew were inaccuracies in his reporting. This inference, in turn, provides a strong basis for a finding of actual malice. See *Chang* v. *Michiana Telecasting Corp.*, 900 F.2d 1085, 1090 (7th Cir. 1990) ("destruction could imply that the notes would have revealed that the reporter did not believe what he wrote or said"); *Torgerson* v. *Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 548 (1997) ("destruction of notes is ordinarily sufficient evidence to support a jury verdict of actual malice").[21]

As has been stated, there was no "confrontation" between

---

[20]Wedge's credibility was further damaged by his testimony that he remembered speaking with Attorney Todd, but could not recall Todd's informing him that the plaintiff had not made the statements.

[21]Three weeks after oral argument, counsel for the defendants filed with this court, pursuant to Mass. R. A. P. 22 (c), as amended, 418 Mass. 1601 (1994), a five-page letter in which he responds to a question concerning the record posed to him during oral argument, and then proceeds to expound on issues argued by the plaintiff in the case. The letter goes beyond the bounds of what is proper under rule 22 (c), which allows an appellant "on request . . . the opportunity to reply in writing to new matter in the arguments of his adversary." The letter reargues significant portions of the defendants' initial brief. Because the content of postargument letters is limited to *new* matters raised at oral argument, we disregard it.

That being said, we cannot disregard one portion of the letter in which counsel for the defendants challenges the sufficiency of the evidence in the record to establish, for purposes of our independent review, a factual determination that Wedge discarded the notebook after being informed, by Attorney Todd, that he had misquoted the plaintiff. Counsel asserts to this court, "[n]either at deposition nor at trial was Wedge even asked whether he

the plaintiff and prosecutors, and Wedge admitted, in his deposition testimony, that the confrontational setting described in his article might have been a fabrication. Based on all of the evidence in the record (as well as the jury's clear lack of belief

discarded his notes before or subsequent to contacting Todd." This assertion is a misrepresentation of the record, the relevant portion of which we now set forth.

COUNSEL FOR THE PLAINTIFF: "And you don't know when you threw them out, do you, sir?"

THE WITNESS: "That's correct. I do not know."

COUNSEL FOR THE PLAINTIFF: "You don't know what day you threw them out, correct?"

THE WITNESS: "Correct."

COUNSEL FOR THE PLAINTIFF: "You don't know what month you threw them out, correct?"

THE WITNESS: "That's correct."

COUNSEL FOR THE PLAINTIFF: "You have no information at all about when you threw your notes out, correct?"

THE WITNESS: "That's correct. I don't remember when I discarded [the] notebooks."

COUNSEL FOR THE PLAINTIFF: "So, you wrote a story on February 13 of 2002 about [the plaintiff] in which you attributed certain words to him in quotation marks, and that story was published on February 13, 2002, correct?"

THE WITNESS: "Yes, that's correct."

COUNSEL FOR THE PLAINTIFF: "And then you threw your notes out, right?"

THE WITNESS: "I don't recall when I threw my notes out."

COUNSEL FOR THE PLAINTIFF: "It was after you wrote your story, wasn't it?"

THE WITNESS: "Yes. It would have been after the story ran."

In sum, Wedge was asked repeatedly when he had thrown out his notes and, each time, Wedge responded that he did not remember. There is no chance that, had Wedge been asked specifically whether it had been before, or after, his conversation with Attorney Todd, he would have responded any differently. Wedge, on cross-examination, could not even confirm defense counsel's leading inquiry as to whether he had discarded his notebook according to his usual practice, within "a matter of days or [a] week" of a story's publication. We find it significant that defense counsel, apparently, made a tactical decision not to ask Wedge directly whether he had discarded his notebook before, or after, speaking with Attorney Todd.

in Wedge's trial testimony), the jury undoubtedly found that Wedge knowingly invented the existence of a confrontation between prosecutors and the plaintiff at the robbery case lobby conference, just as he altered the "tell her" quotation, as a means to heighten the dramatic impact of his story. With respect to the statements that the "victim tearfully took the stand" and that the plaintiff "heartlessly demeaned victims," neither Wedge, or any other Herald reporter, could name any source for these statements. It is more than reasonable to infer that he made them up out of whole cloth, in order to create a more compelling story. Falsely creating the context in which the plaintiff's remarks were supposedly made is also, in our view, persuasive evidence that Wedge was aware of the falsity of the remarks themselves. See *St. Amant* v. *Thompson*, 390 U.S. 727, 732 (1968) ("Professions of good faith will be unlikely to prove persuasive . . . where a story is fabricated by the defendant [or] is the product of his imagination . . .").

The jury found, and we agree, that there was, in fact, no legitimate basis for reporting in the Herald that the plaintiff stated of a young rape victim, "She's [fourteen]. She got raped. Tell her to get over it"; that the plaintiff made the statement when "confronted" by prosecutors; that the rape victim "took the stand and tearfully told the [plaintiff] how the rape had affected her"; or that the plaintiff "heartlessly demeaned" victims. Deposition testimony of Patrick J. Purcell, the owner and publisher of the Herald, who was an unavailable witness, was read into the record at trial without objection. In his testimony, Purcell admitted that he knew that attributing the "tell her to get over it" quotation to a judge in the Superior Court would cause a "media frenzy." The conclusion is inescapable that a "media frenzy" was, in fact, exactly what the defendants intended. We recognize that the "actual malice" standard is a formidable one that cannot be met merely with evidence of a desire to increase profits, or even ill will on the part of a publisher. See *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657, 666-667 & n.7 (1989). Our examination of the record as a whole, nevertheless, satisfies us that, apart from Purcell's testimony (which furnished context for the jury in evaluating the issues before them on correct

instructions of law), the record contains sufficient evidence to permit the conclusion that the defendants published the quotation, and other defamatory statements concerning the plaintiff, with knowledge of their falsity or with serious doubts as to their truth.[22]

d. Finally, we address the remarks made by Wedge on "The O'Reilly Factor" on March 7, 2002: "Yes, he [the plaintiff] said this. He made this comment to three lawyers. He knows he said it, and everybody else that knows this judge knows that he said it." The statements were not true. The defendants in their brief characterize Wedge's comments as "classic protected hyperbole." We disagree. The question posed ("Are you absolutely one hundred per cent sure?") was a serious one and no reasonable viewer would interpret Wedge's response as anything other than a serious response based on his knowledge of actual facts. See *Lyons* v. *Globe Newspaper Co.*, 415 Mass. 258, 266-267 (1993). Cf. *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 711 (1987).

Wedge knew that three lawyers did not tell him that they heard the statement. Wedge also knew that the plaintiff, through his attorney, had categorically denied to Wedge that he had made the statement. In an interview with the Boston Globe published on March 6, 2002, the plaintiff denied publicly that he had made the remarks reported by Wedge. In the same article, a clerk in the Superior Court for Bristol County, Marcel Gautreau, who had been present at the robbery case lobby conference in which the statements were purportedly made, was quoted as stating that he had attended five dozen lobby conferences with the plaintiff, and nothing like the reported remarks "would ever come out of his mouth." Although Wedge initially claimed at trial that he could not recall reading the March 6 Boston Globe article before appearing on "The O'Reilly Fac-

---

[22]To the extent that there is any doubt that a corporate defendant, such as the Herald, is capable of possessing the subjective state of mind required for a determination of "actual malice," we put that doubt to rest. Where an article is written within the scope of a reporter's employment, his "state of mind" may be imputed to his employer for purposes of liability. *Tosti* v. *Ayik*, 394 Mass. 482, 493 (1985), *S.C.*, 400 Mass. 224, cert. denied sub nom. *United Auto Workers, Local 422* v. *Tosti*, 484 U.S. 964 (1987), citing *Cantrell* v. *Forest City Publ. Co.*, 419 U.S. 245, 253-254 n.6 (1974).

tor," he was forced to admit he had read it when confronted with the fact that he had been asked about the article on the show. Despite having read about the plaintiff's public denial, Wedge made no attempt to contact Gautreau, or anyone else who had been present when the statements purportedly were made, before appearing on "The O'Reilly Factor," or after. Wedge testified at trial that nothing in the Boston Globe article changed his mind about what he had written. This testimony suggests, decisively, that Wedge possessed either a brazen disregard for the actual truth or a deliberate intent to give credence to a controversial story that he knew (at the time) to be false. We have no hesitation in agreeing with the jury that Wedge's comments on "The O'Reilly Factor" were made with actual malice.

2. The defendants point out that almost one-third of the jury's verdict, and assessment of damages, stem from articles written by Herald reporters other than Wedge, who picked up on, and repeated, portions of Wedge's articles (most notably, the "tell her to get over it" statement, see note 6, *supra*). The defendants contend that, under *Sullivan* and its progeny, the plaintiff may not recover damages for any libelous statements therein without proof of actual malice as to each reporter. We disagree. An original publisher of defamatory material is liable for subsequent republication where "the repetition was authorized or intended by the original defamer, or the repetition was reasonably to be expected." Restatement (Second) of Torts § 576 (1977). Our own cases on point are, admittedly, of pre-*Sullivan* vintage. See *Burt* v. *Advertiser Newspaper Co.*, 154 Mass. 238, 247 (1891); *Miller* v. *Butler*, 6 Cush. 71, 74 (1850). They are consistent with First Amendment jurisprudence that has since developed and, therefore, remain good law.

Here, it is established, by clear and convincing evidence, that the defendants acted with actual malice in publishing defamatory and false statements about the plaintiff in Wedge's original article. Not only could Wedge and the Herald reasonably have foreseen that other reporters at the Herald would repeat the libelous, "She's [fourteen]. She got raped. Tell her to get over it" statement, there can be no real doubt that the reporters were

authorized (and even encouraged) to do so.[23] The Herald is responsible both for publishing the libelous statements in Wedge's original articles and for republishing the libelous statements in subsequent articles. The proposition, asserted by the defendants in their brief, that "[a] newspaper company, as a corporation, does not have a state of mind of its own that can be imputed from one reporter to the next, let alone from one article to the next," has no relevance here.

3. The defendants assert no direct claim that the damages awarded by the jury were excessive, but assert the following evidentiary errors as they relate to damages.

a. In the days following the publication of the February 13 and 14 Herald articles, the plaintiff received boxes of angry letters from people he did not know, many of them explicitly referring to the "tell her to get over it" comment. Some of the letters contained death threats. The first death threat was slipped under the door of his chambers. It consisted of a portion of the February 13 Herald article, with a target drawn over the plaintiff's face. A bullet hole was drawn on the plaintiff's forehead, and the photograph was inscribed with the words, "YOU'RE DEAD! 'GET OVER IT' YOU BASTARD!"

The judge properly permitted the jury to consider the hate mail. The defendants' suggestion that there was no evidence linking the mail to the Herald articles has no basis.

b. The plaintiff, his wife, and two of his five daughters presented credible and compelling testimony about the emotional impact on the plaintiff of being made the target of public disgrace by the Herald. The jury heard evidence that the plaintiff saw offensive statements concerning himself, and threats of violence against his daughters, in an Internet "chat room," established and maintained by the Herald, in which people were able to "chat" with Howie Carr, a Herald columnist and local radio talk show host, who had written a column published in the Herald on February 20, deriding the plaintiff and repeating the "tell her to get over it" statement. The defendants argue that it was error to allow evidence of the comments in the chat room because the

---

[23]One Herald reporter testified that she placed a reference to the plaintiff in an article published in the Herald on October 16, 2003, because her editors had instructed her to do so.

plaintiff demonstrated "no link between the postings and any allegedly defamatory statements" in the Herald, including Carr's column. There was no error.[24] The judge properly instructed the jury: "The pain and suffering for which [the plaintiff] is entitled to recover in this action is the pain and suffering which the defamatory statement was, or were, a substantial factor in producing. Mental or physical pain and suffering produced by some other event, act, or omission, is not something from which [the plaintiff] may recover here." The defendants did not object to the instruction.

c. The jury heard evidence that the plaintiff's teenage daughter suffered from acute emotional trauma in the wake of the Herald articles, due to her constant concern for her father and her family's safety. The jury properly could consider the emotional distress experienced by the plaintiff as a result of watching his daughter suffer. The defendants assert that a defamation plaintiff may only recover for emotional distress damages caused by injury to the plaintiff's reputation. This is an incorrect statement of the law. "A plaintiff in a successful defamation case is entitled . . . to fair compensation for actual damages, including emotional distress and harm to reputation (and any special damages that have been pleaded and proved)." *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 404-405, cert. denied sub nom. *Globe Newspaper Co.* v. *Ayash*, 126 S. Ct. 397 (2005). See *Shafir* v. *Steele*, 431 Mass. 365, 373 (2000), quoting *Markham* v. *Russell*, 12 Allen 573, 575 (1866) (damages for libel limited to compensatory damages for actual injury, including harm to reputation and mental suffering, and with mental suffering plaintiff entitled to recover for "distress and anxiety which may have been the natural result of the legal wrong"); *Mahoney* v. *Belford*, 132 Mass. 393, 394 (1882) (recovery for "mental feelings . . . which [are] the natural and

---

[24]The defendants also assert that § 230 (c) of the Federal Communications Decency Act immunizes the Herald from liability. See 47 U.S.C. § 230(c) (2000). This argument has no merit. The defendants are not disinterested Internet service providers, but the actual publishers of the original defamatory statements, as well as the owners and operators of the Howie Carr Internet site. Moreover, the evidence relating to the content of the chat room was introduced, not to support a claim of libel against the Herald, but as evidence of the emotional distress suffered by the plaintiff.

necessary result of the [defamation]"). As stated above, the jury were properly charged, and the defendants lodged no objection to the charge.

d. The jury heard expert testimony concerning the nature of journalistic standards generally considered acceptable in the field of journalism and within the media. Based on principles contained in various codes of journalistic ethics, such as the Code of Ethics for the Society for Professional Journalists, as well as on principles found in "every daily newspaper that expects itself to be taken seriously," the expert witness testified that it is never considered permissible to fabricate the context of a story or to alter words within a quotation. She opined, among other matters, that potentially explosive information should be verified by at least two independent primary sources before being published, and, when possible, the "best thing . . . is to get [a] quote directly from the person who [said] it." She noted that reporters should be cautious about the bias of sources who "have their own agenda." On cross-examination, the expert admitted that not every reporter or editor would agree about how journalistic standards should be applied in any one particular situation and that the diligence required of a reporter seeking to verify a quotation, in a particular instance, would depend on the context, and time line, of an article. She clarified, however, that "there is something that is so far below the standard that it counts as trying not to get the other side of the story."

The defendants argue that the admission of the expert testimony was erroneous, because general standards in the profession are irrelevant to actual malice, which concerns the subjective state of mind of the defendant. It is true that the failure to abide by established journalistic standards is not, by itself, sufficient to demonstrate actual malice. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant* v. *Thompson*, 390 U.S. 727, 731 (1968). See *Twohig* v. *Boston Herald-Traveler Corp.*, 362 Mass. 807, 810 (1973). A plaintiff is entitled to prove the defendants' subjective state of mind through circumstantial evidence, however, and evidence concerning a reporter's apparent reckless lack of care may be one factor in the

actual malice inquiry. See *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657, 668 (1989) ("it cannot be said that evidence concerning . . . care never bears any relation to the actual malice inquiry"). The judge's decision to admit the expert testimony was within his discretion.

e. The Herald suggests that it should not be held liable for statements made by Wedge on the "The O'Reilly Factor." We reject the suggestion. Wedge was acting within the scope of his employment at all times relevant to this case and appeared on the television show with the approval, and encouragement, of his editors. The Herald's attempt to escape liability for words spoken by its reporter, about articles published in its newspaper, is without merit.

4. The defendants contend that two letters sent privately by the plaintiff to the Herald's owner (one written on official court stationery) after the verdict, in which the plaintiff demanded the payment of money to "end the case," created an appearance of impropriety that warrants vacating the judgment and dismissing the complaint. The defendants filed a motion to vacate the judgment and dismiss the complaint under Mass. R. Civ. P. 60 (b), 365 Mass. 828 (1974). The judge properly denied the motion. Any appearance of impropriety connected to the two letters could not possibly have tainted the trial, because the letters were sent after the trial ended. Whether there has been a violation of applicable ethical rules is a matter for determination by the Commission on Judicial Conduct.

5. One final point is in order. We have other arguments, made in support of the defendants, which emphasize the importance of independent appellate review of actual malice findings to the continued ability of the press to report on criticism of the judicial branch of government (a long-standing tradition in the Commonwealth) and the importance of defending the freedom of the press to report on such matters. The proponents of the arguments refer to cases emphasizing the public's right to know what goes on in court rooms and direct our attention to the fact that news reports about the operation of the courts routinely depend on information provided by local and State law enforcement officials.

No one would disagree with the importance of upholding the

freedom of the press. Nor would anyone disagree about the media's right (and duty) to examine the affairs of the judicial branch of government and to criticize activities of judges and other court officials that do not meet the high standards expected of judges and the courts. The press, however, is not free to publish false information about anyone (even a judge whose sentencing decisions have incurred the wrath of the local district attorney), intending that it will cause a public furor, while knowing, or in reckless disregard of, its falsity. The jury's verdict in this case reflects their conclusion that Wedge and the Herald defamed the plaintiff, and that they did so with actual malice and an awareness that they were enabling a campaign by the district attorney for the Bristol district to discredit the plaintiff by attacking the core attributes a judge must possess — even temperament, lack of any bias, fairness at all times, and a particular sensitivity to the plight of victims of crimes. See note 9, *supra.* The statements in the Herald are not the type of "erroneous" statements recognized by the Supreme Court to be "inevitable in free debate, and that . . . must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.' " *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 271-272 (1964), quoting *N.A.A.C.P.* v. *Button,* 371 U.S. 415, 433 (1963).

6. The judgment, as modified by the judge, is affirmed.

*So ordered.*