**MUTUAL INSURANCE COMPANY, LIMITED, Plaintiff,**

v.

**The Honorable Ernest B. MURPHY, Defendant.**

**Civil No. 07–11532–PBS.**

United States District Court, D. Massachusetts.

July 1, 2009.

As Amended July 2, 2009.

Stephen J. Brake Nutter, Sarah P. Kelly Nutter, McClennen & Fish, LLP, Elizabeth A. Ritvo, Brown Rudnick Berlack Israels LLP, Boston, MA, for Defendant.

Joseph S. Sano, Prince, Lobel Glovsky & Tye LLP, Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *INTRODUCTION*

Former state court Judge Ernest B. Murphy alleges that Mutual Insurance Company, Limited ("Mutual") engaged in unfair and deceptive acts in violation of Massachusetts law when it failed to make a prompt offer of settlement to him. Mutual moves for summary judgment on the ground that it owed no duty to effectuate a settlement pursuant to Mass Gen. Laws chs. 176D and 93A because Mutual did not control either the defense or settlement of the claim. Mutual moves for summary judgment on Count I of its complaint seeking a Declaratory Judgment and on Murphy's counterclaim alleging that Mutual violated Mass. Gen. Laws chs. 176D and 93A. After a hearing and review of the submissions, I *ALLOW* Mutual's motion for summary judgment.

### II. *BACKGROUND*

The following facts are undisputed except where stated.

### A. History of Litigation

On June 3, 2002, Murphy commenced a defamation action in the Massachusetts state courts against the Boston Herald and four Herald reporters and columnists. At that time, the Herald held an insurance policy ("the Policy") issued by Mutual which covered, *inter alia,* claims for damages arising out of "libel, slander ... or other forms of defamation or tort related thereto...." (Policy, Section I) (Pl.'s Statement of Undisputed Material Facts ("Pl.'s SOF") [Docket No. 44], Ex. 7.) Under the Policy, the Herald was responsible for the first $50,000 of loss (including defense expenses) for any event. (Policy, Declarations, Item 5.) After the exhaustion

of this $50,000 "retention," the Herald was responsible for twenty percent of all remaining defense expenses up to a maximum of $500,000. (*Id.*) The Policy had a total liability limit of $15 million. (Policy, Renewal of Certificate (amending limit of liability to $15 million).)

A trial on the defamation action was held in January and February 2005. *See generally Murphy v. Boston Herald, Inc.*, 449 Mass. 42, 46–47, 865 N.E.2d 746 (2007) (detailing the procedural history of the case). The law firm Brown Rudnick, which has handled all of the Herald's general liability and media liability work since 1994, represented the Herald. At the conclusion of the evidence, the trial court directed verdicts for two of the four individual defendants, but submitted the majority of the remaining claims (sixty-one of sixty-seven alleged defamatory statements) to the jury. After four days of deliberations, the jury returned a verdict of $2.09 million in damages against the Herald and one individual defendant, the reporter Mr. David Wedge. The Herald and Mr. Wedge filed a motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial and for remittitur. The judge denied the motion for a new trial, but concluded that three of the twenty-two statements for which the jury had held defendants liable were "protected statements" and reduced the damages award to $2.01 million. *See Murphy*, 449 Mass. at 46–47, 865 N.E.2d 746. In November 2005, the defendants filed a timely appeal and Murphy cross-appealed. On May 7, 2007, the Massachusetts Supreme

Judicial Court affirmed the judgment as modified by the trial court. *Id.* at 43, 70, 865 N.E.2d 746. The Supreme Judicial Court denied the Herald and Mr. Wedge's petition for rehearing on June 4, 2007. Three days later, Mutual (through counsel) paid Murphy $3,414,687 in satisfaction of the judgment, including post-judgment interest and costs.

Just over a month after receiving the payment, on July 17, 2007, Murphy sent a demand letter to Mutual.[1] (*See* Pl.'s SOF, Ex. 4.) In the letter, Murphy alleged that Mutual had violated Mass. Gen. Laws chs. 176D and 93A by engaging in unfair and deceptive acts and practices, specifically citing "Mutual's refusal to effect a prompt offer of settlement to Judge Murphy after the liability of Mutual's insured The Boston Herald ... became reasonably clear" and "Mutual's refusal to first conduct a reasonable investigation of all the relevant facts and circumstances before refusing to satisfy the judgment in favor of Judge Murphy." (*Id.*) The letter demanded that Mutual pay $6.8 million (treble the amount of the jury verdict including interest) to Murphy in satisfaction of these chapter 93A and 176D claims. (*Id.*)

On August 16, 2007, Mutual commenced this action seeking a declaration of its non-liability under Mass Gen. Laws chs. 93A and 176D. (*See* Pl.'s SOF, Ex. 1; Compl. [Docket No. 1].) In addition to answering Mutual's complaint, Murphy filed a counterclaim, alleging that Mutual violated both Mass. Gen. Laws. chs. 93A and 176D. (*See* Pl.'s SOF, Ex. 2; Answer and Counterclaim [Docket No. 4].)

---

1. This was not the first letter Murphy sent to Mutual regarding his belief that, pursuant to Mass. Gen. Laws chs. 176D and 93A, Mutual was obligated to make a good faith offer of settlement or satisfy the jury verdict. (*See* Murphy Counterclaim [Docket No. 4] ¶¶ 8, 14, 31, 63) (describing communications from Murphy to Mutual demanding either a good faith offer of settlement or satisfaction of the jury verdict and asserting that failure to do so would constitute violations of Massachusetts law). According to Murphy, Mutual responded to the demands by stating, as it maintains here, that it owed no duties to Murphy under Massachusetts law. (*Id.* at ¶¶ 10, 17, 32.)

## B. The Policy

The Herald was insured under a media insurance policy issued by Mutual. The Policy indemnifies the Herald for losses in excess of $50,000 (the agreed upon self-retention amount) and up to $15 million from a claim for damages arising out of, *inter alia,* "libel, slander, product or personal disparagement, trade libel, or other forms of defamation or tort related thereto . . . ." (Policy, Section I.) Under the Policy, the Herald has a duty to retain its own counsel for the defense or settlement of a claim, though the choice of counsel is "subject to the continuing approval of [Mutual]." (Policy, Section VIII.B.(2)(b).) The Herald also is obligated to advise Mutual and its counsel of "the likelihood of the [Herald's] success or failure; an initial estimate of legal costs; offers of settlement, if any; and any special information which would be pertinent to the claim or defense thereof." (*Id.*) When it is clear that the costs incurred will likely exceed the retention amount (here, $50,000), the Herald is required to notify Mutual and regularly update it as to legal expenses. (Policy, Section VIII.B.(2).) As for Mutual's obligations, the Policy explicitly states, "The company shall not be called upon to assume charge of the settlement, or the defense of any claim made, or suit brought, or proceeding instituted against the insured . . . ." (Policy, Section VIII.B.(3).) The Policy, however, grants Mutual several rights with respect to the defense and settlement of claims:

> (3) [Mutual] shall have the right and shall be given the opportunity to associate with [the Herald] in the defense and control of any claim, suit, or proceeding which involves, or appears likely to involve, payment by [Mutual], in which event [the Herald and Mutual] shall cooperate fully in the defense or settlement of such claim, suit or proceeding; or (b) upon dissatisfaction with [the Her-

ald's] retained counsel, suggest the replacement thereof with new counsel to be jointly appointed by [Mutual] and [the Herald], for the defense and control of any claim, suit or proceeding which involves, appears likely to involve, payment by [Mutual]. The suggestion of new counsel by [Mutual] shall not be unreasonably denied by [the Herald]. No settlement shall be made without [Mutual's] consent, such consent not to be unreasonably withheld.

> (4) If a judgment is rendered in any suit against [the Herald], and [the Herald] is not willing to appeal therefrom, [Mutual] shall have the right to appeal from such judgment and shall bear the costs thereof plus the interest incidental to such appeal.

(Policy, Section VII.B.(3)-(4).)

## III. *DISCUSSION*

### A. Standard for Summary Judgment

Summary judgment is appropriate when " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36–37 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must

set forth specific facts showing there is a genuine issue for trial.'" *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

## B. Chapters 176D and 93A

■ Section 3 of Mass. Gen. Laws ch. 176D regulates unfair acts and practices in the business of insurance and explicitly forbids "unfair claim settlement practices." Mass. Gen. Laws. ch. 176D, § 3(9). The prohibitions on unfair settlement practices "were enacted to encourage settlement of insurance claims ... and discourage insurers from forcing claimants into unnecessary litigation to obtain relief." *Morrison v. Toys "R" Us, Inc.*, 441 Mass. 451, 454, 806 N.E.2d 388 (2004) (internal quotation marks omitted). The section prohibits "[f]ailing to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." Mass. Gen. Laws ch. 176D, § 3(9)(f); *see Rhodes v. AIG Domestic Claims, Inc.*, No. 05–1360–BLS1, 2008 WL 2357015, *14 (Mass.Super. Ct. June 3, 2008) (Gants, J.) (describing § 3(9)(f) as the "best known" of the prohibited settlement practices). Conduct by insurers prohibited under Mass. Gen. Laws. ch. 176D, § 3(9) gives rise to a cause of action under Mass. Gen. Laws 93A, § 9(1). *See Morrison*, 441 Mass. at 454, 806 N.E.2d 388 (stating that

the prohibitions of chapter 176D § 3(9) were imported into Chapter 93A "to subject insurers committing violations to the remedies available to an injured party under the consumer protection statute") (internal quotation marks omitted); *Murphy v. Nat'l Union Fire Ins. Co.*, 438 Mass. 529, 532 n. 5, 781 N.E.2d 1232 (2003); *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. West Lake Acad.*, 548 F.3d 8, 12 n. 2, 19 (1st Cir.2008).

■ An insurer owes the duty to effectuate a prompt settlement not only to its policyholders, but also to those third parties making claims against its policyholders. *See Clegg v. Butler*, 424 Mass. 413, 418–19, 676 N.E.2d 1134 (1997) (stating that Massachusetts case law clearly establishes that third-party claimants can bring actions pursuant to Chapter 93A against liability insurers who breach the duties of settlement contained in chapter 176D); *Van Dyke v. St. Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 674–75, 448 N.E.2d 357 (1983).

## C. What's in a Name?

■ Mutual describes the Policy as a specialized policy of media insurance which gives media companies the right to protect their reputation by preventing insurers from settling defamation claims. (*See* Schaefer Dep. 63:6, 67:2–10, Sept. 3, 2008 [Pl.'s SOF, Ex. 8] (Mutual's 30(b)(6) designee stating that the Policy, termed a "First Amendment policy," is a "limited line of coverage" designed "[t]o allow the insured complete control over the defense of its First Amendment related defamation claims" because "that's what the publishing industry want[s]").) Mutual insists that it is "not a liability policy but [rather] is an indemnity policy." (Pl.'s Mem. 11.)

A traditional liability insurance policy confers the right to settle and defend

any claims on the insurer and prevents the insured from participating in the defense of a claim. A traditional indemnity policy, by contrast, leaves the duty to settle and defend on the insured, requiring the insurer to indemnify the insured for claims paid within the policy's coverage.

*Sta–Rite Indus., Inc. v. Zurich Re (U.K.) Ltd.*, 178 F.3d 883, 885 (7th Cir.1999). *See generally* 1 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 1:34 (3d ed. 2005) (explaining the difference between "liability" and "indemnity" insurance but adding that "the distinction is less important under modern insurance practice"). Mutual also likens the Policy to what is known as an "excess" (as opposed to primary) insurance policy because the Policy only attaches once the Herald's self-insured retention of $50,000 is exhausted. As such, Mutual contends that its role, as created by the terms of the Policy, is best described as "an excess indemnity insurer." (Pl.'s Mem. 11.)

Murphy disputes the characterization of Mutual as an excess insurer, arguing that the rights which Mutual retained under the Policy (particularly the right to suggest counsel and the right to appeal) are not typically, found in excess policies. Murphy also contends that the label "excess insurer" would mean little here anyhow, as, in his view, it did not take long for it to become apparent that the Herald's $50,000 retention would be exceeded and that, as a result, Mutual would be "on the line" for eighty percent of additional costs.

That the parties make much of these labels is not surprising, as the type of insurance policy can impact a determination as to when, if ever, an insurer's duty and obligations under chapters 176D and 93A are triggered. For example, in cases involving two or more insurers—one primary and one excess—an excess insurer generally is not subject to the fair and prompt settlement obligations of Mass. Gen. Laws ch. 176D § 3(9)(f) until the primary insurer has acted. *See Clegg*, 424 Mass. at 422 n. 8, 676 N.E.2d 1134. In a recent case in which the plaintiffs alleged that both the primary and excess insurers of the insured had breached their statutory obligation to effectuate settlement, the court conducted separate inquiries as to each insurer. *Rhodes*, 2008 WL 2357015, at *16, *21. In its evaluation of the claims, the court identified the moment when the primary insurer "effectively tendered its policy limits" to the excess insurer as the critical dividing line. *Id.* at *19. Prior to the tender, only the primary insurer bore the statutory obligation to make a settlement offer to the plaintiffs, but once the tender had occurred, "the obligation to make a settlement offer had shifted to [the excess insurer]." *Id.* at *19, *21 (explaining that prior to the tender the "excess insurer ... had no duty to make any settlement offer to the [plaintiffs]").

In cases in which the policy includes a retention provision (where the insured retains responsibility for a certain amount of liability exposure), the insurer does not have any obligation to the injured party until the insured has tendered the claim to the insurer for defense or indemnification. In *O'Connell v. Reliance Insurance Company*, 50 Mass.App.Ct. 334, 737 N.E.2d 13, 16–17 (2000), for example, a Massachusetts Appeals Court upheld the dismissal of an injured plaintiff's claims under Mass. Gen. Laws chs. 93A and 176D where it was reasonable for the insurer to conclude that it had no duty with respect to a claim that was within the monetary limits of the insured's self-retention. *Cf. Tilton v. Nat'l Union Fire Ins. Co.*, No. 07–10163, 2008 WL 781921, *1 (D.Mass. March 20, 2008) (characterizing a $5 million retention as self-insurance by

the insured and stating that it was "difficult to conceive of any obligation" that the insurer would have had to the claimant when the judgment was within the retention limit).

Here, the Policy may best be described as a hybrid. *Cf. Sta–Rite,* 178 F.3d at 885 (concluding that an insurance policy which allowed the insurer "to associate with the defense and settlement of claims within policy coverage" but did not "exclud[e] [the insured] from participating in the defense of claims" was a "hybrid" of traditional liability and indemnity policies). Regardless of the label, though, the parties agree that criterion of control over defense and settlement governs whether Mutual ever incurred a duty to effectuate prompt, fair, and equitable settlement under Massachusetts law.

## D. Control

Proof of "control" is central to duty to settle inquiries under Mass. Gen. Laws chs. 176D and 93A. *See, e.g., Tilton,* 2008 WL 781921, at *1 (applying Massachusetts law and concluding that an insurer had no obligation to the claimant when the insurer had "remained uninvolved and uninformed about all aspects of the claim" and never paid any monies toward the judgment, which was within the insured's retention amount); *Rhodes,* 2008 WL 2357015, at *21 (concluding that an excess insurer only incurred the duty to make a prompt and fair settlement offer under chapter 176D once it had "assumed responsibility for and control over the ... claim"). *See generally Morrison,* 441 Mass. at 455, 806 N.E.2d 388 (stating that "[o]ne obvious legislative concern" underlying chapter 176D "was that entities that profit from selling insurance policies not abuse exclusive rights and duties to control litigation vested through those same policies"); *Green v. Blue Cross and Blue Shield of Mass., Inc.,*

47 Mass.App.Ct. 443, 713 N.E.2d 992, 996 (1999) ("It has long been established, even before the passage of chapters 93A and 176D, that an insurer has an obligation to act in good faith.") (citing *Murach v. Mass. Bonding and Ins. Co.,* 339 Mass. 184, 186–87, 158 N.E.2d 338 (1959) (holding that, when an insurance policy "leaves the matter of settlement entirely to the insurer's discretion," the insurer has a "reciprocal obligation" to act in good faith in deciding whether to settle or go to trial)); 14 *Couch on Insurance, supra,* §§ 203.13–203.14 (stating that the "basis of the insurer's duty to settle within policy limits is the insurer's exclusive control over settlement negotiations and defense of litigation, which results in a conflict of interest between the insurer and the insured" and that the "implied covenant of good faith and fair dealing requires an insurer to settle where appropriate even if the duty is not expressly imposed in the terms of the policy"). Therefore, the key question here is whether Mutual wielded enough control over the defense or settlement to trigger obligations under chapter 176D.

### 1. *Policy Language*

▉ Here, the language of the Policy does not bestow control over the litigation upon Mutual. The Policy places the initial burden of defense on the insured (the Herald) and relieves Mutual of any obligation to assume charge of either the defense or settlement of any claim. (*See* Policy, Section VIII.B.(2)(b) (stating that the insured (the Herald) will retain counsel for the defense or settlement of any claim brought for injuries covered by the Policy); Policy, Section VIII.B.(3) ("[Mutual] shall not be called upon to assume charge of the settlement, or defense of any claim made, or suit brought, or proceeding instituted against [the Herald] . . . .").)

Likewise, the Policy provides Mutual with only limited powers of settlement. The Herald was free to discuss and negotiate settlement agreements with claimants without Mutual's participation. And though Mutual's consent was required before any settlement could be completed, the Policy states that "such consent [will] . . . not . . . be unreasonably withheld" by Mutual. (Policy, Section VIII.B.(3).) In addition, unlike many liability insurance policies, the Policy does not grant Mutual any independent power to settle contrary to the Herald's desires. (*See* Schaefer Dep. 70:20–71:4 (Mutual's 30(b)(6) designee stating that "Mutual had no right to settle the case contrary to the desires of the Herald. There's no hammer clause[2] in this policy that permits the insurer to settle a case contrary to the will of the insured").)

The Policy does grant Mutual the "right" and "opportunity" to "associate with [the Herald] in the defense and control of any claim, suit or proceeding which involves, or appears likely to involve, payment by [Mutual]." (Policy, Section VIII. B.(3) (stating that, in the event Mutual exercises this right, the Herald and Mutual "shall co-operate fully in the defense or settlement of such claim, suit or proceeding").) Murphy contends that this "right to associate" clause, coupled with Mutual's right to appeal a judgment if the Herald declines to do so and its powers over the selection of counsel, constitutes sufficient control over the litigation to trigger the good faith obligation to settle under Massachusetts law. This argument falls short. The Policy language is unambiguous: it grants Mutual the right, but not the obligation, to participate in the defense and settlement of the claim. Similarly, Mutual

possessed the right, but did not have an obligation, to appeal a judgment. (*See* Policy, Section VIII.B.(4).) Moreover, this right would only arise if the Herald were to have a judgment rendered against it and if the Herald decided not to appeal the judgment. (*Id.*)

In essence, Murphy is asking this Court to conclude that by possessing an option to intervene—whether or not the option was ever invoked—Mutual exerted sufficient "control" over the defense to trigger a duty to settle. Courts confronting "right to associate" clauses in other contexts have found similar arguments unpersuasive, as do I. *Cf. Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 536 F.2d 730, 736 (7th Cir. 1976) ("The reservation of the option to 'associate' in the defense imposes no duties when that option is not exercised."); *Employers' Liab. Assurance Corp. v. Hoechst Celanese Corp.*, 43 Mass.App.Ct. 465, 684 N.E.2d 600, 610 (1997) (characterizing a provision nearly identical to that in the policy between Mutual and the Herald as an "assistance and cooperation clause" and concluding that it unambiguously "exempts the insurer from assuming charge of the defense and settlement of claims"). The power to veto or suggest counsel is also an option, and without more, does not suffice to demonstrate control. In fact, the only concrete requirements cited by Murphy are the obligations of the Herald to notify Mutual of claims and to keep Mutual advised of "relevant information" and, in some cases, legal bills. (Policy, Section VIII.B.(2).) These provisions do not require any action by Mutual and cannot be read to constitute control.

Here, it was the insured (the Herald)—not the insurer (Mutual)—that held the key to settlement. (*See* Schaefer Dep.

---

**2.** A "hammer clause" generally requires an insurer to seek an insured's approval prior to settling the claim for a specified amount, but allows the insurer to limit its liability to that amount if the insured rejects the settlement. (Pl.'s SOF ¶ 59, n. 1.)

70:20–71:4 (Mutual's 30(b)(6) designee stating, "Mutual had no right to settle the case contrary to the desires of the Herald.")); *cf. Morrison*, 441 Mass. at 458, 806 N.E.2d 388 (stating, in a self-insurance case, that the requirements of chapter 176D § 3(9) do not serve as a "blanket guarantee to consumers that claims against companies with which they do business, even claims in which liability is clear, will be settled before going to court"). Mutual concedes that, had the Herald decided to settle and sought Mutual's permission to do so, Mutual would then have incurred a duty of good faith to Murphy not to withhold approval. However, it is undisputed that, throughout the litigation, the Herald never indicated any desire to settle. (*See, e.g.,* Pl.'s SOF ¶ 61 (stating (undisputed by Murphy) that the Herald never requested Mutual's permission to settle); Magram (the Herald's 30(b)(6) designee) Dep. 155:7–9, Aug. 28, 2008 [Pl.'s SOF, Ex. 10] ("Q. Did the Herald ever request Mutual's consent to settle the Murphy case? A. No.").) Accordingly, the terms of the Policy did not, on their own, trigger a duty to settle on Mutual's part.

### 2. *Mutual's Actions*

■ Mutual concedes that, if at any point in the litigation, it had assumed control over the defense of the claim, doing so would have triggered obligations, including the duty to settle, under chapter 176D § 3(9)(f). Mutual insists, however, that it never assumed control of defense or settlement. Murphy disagrees. Thus, the key question is whether there is sufficient evidence for a reasonable jury to conclude that Mutual assumed control of the defense or settlement of the claim, thereby triggering the duty to effectuate prompt, fair, and equitable settlement under chapter 176D § 3(9)(f).

Mutual points to the sworn deposition testimony of both the Herald and Mutual's 30(b)(6) designees who both state that the Herald, not Mutual, controlled the litigation at all times. (*See* Schaefer (Mutual's designee) Dep. 67:11–16 ("Q. Okay. At any time prior to the satisfaction of the judgment in Judge Murphy's case, did Mutual involve itself in the strategy for defense of the case including . . . during the period of appeal? A. Never."); Magram (the Herald's designee) Dep. 48:17–51:8, 97:3–13 (repeatedly stating that "The Boston Herald, with the advice of counsel" controlled the defense throughout the entire case).)

Mutual does admit that, for approximately six months in 2005 (May 12 through November 8), Mutual and the Herald jointly engaged the firm of Baker & Hostetler to evaluate the probability of success of an appeal from the jury verdict. (Pl.'s SOF ¶¶ 83–86 Ex. 11, Magram Aff. ¶ 4.) According to Mutual, the joint engagement was predicated on the recognition that the Herald and Mutual had a "common interest" in seeking an objective opinion of the probability of success on appeal. (Pl.'s SOF ¶¶ 84–85.) Mutual states that the joint representation ended on November 8, 2005, the day that the Baker & Hostetler attorney rendered his opinion, (Pl.'s SOF ¶ 86), and maintains that no further work was performed by Baker & Hostetler for Mutual after that date. (Pl.'s SOF ¶ 88.) Mutual adds that the decision to file an appeal was made entirely by the Herald alone. (*See* Pl.'s SOF ¶ Schaefer Dep. 128:23–129:6 (Mutual's 30(b)(6) designee stating that the Herald made the decision to appeal the verdict and that Mutual had no role in the decision); Magram Dep. 46:14–21 (the Herald's 30(b)(6) designee stating that the Herald made the decision to appeal).)

Murphy, however, contends that Mutual's involvement was more extensive and

longlasting. First, Murphy contends that it was Mutual, not the Herald, that suggested that new counsel be hired for the appeal and specifically pushed the Herald to retain Bruce Sanford of Baker & Hostetler. (*See* Def.'s Resp. to Pl.'s SOF ¶ 71 (citing an e-mail from Herald employee to Mutual employee stating that the Herald is "comfortable using Bruce Sanford for the initial review of the possible appeal in the Judge Murphy case" and that they were "also agreeable with . . . [Mr. Schaefer of Mutal's] proposed letter to Mr. Sanford") (Kelly Aff. [Docket No. 49] Ex. 3).) Mutual presents the scenario differently, stating that the Herald independently decided that it wanted new counsel for the appeal and sought Mutual's advice on whom to consider. According to Mutual, it provided the Herald with a list of several attorneys, including Mr. Sanford, and recommended that whoever the Herald chose as appellate counsel should be asked to conduct an objective review of the merits of the appeal before charging forward. The decision to retain Mr. Sanford and Baker & Hostetler for the objective review and, more generally, as appellate counsel was, according to Mutual, made solely by the Herald and its publisher. (*See* Pl.'s SOF ¶¶ 71–82.)

■ Second, Murphy contends that Mutual's involvement went much deeper than Mutual concedes, with Mutual "usurp[ing] defense of the claim" after the jury verdict and engaging in strategy discussions with the Herald and its counsel. (Def.'s Mem. in Opp'n 14.) For support, Murphy points to multiple entries in the privilege logs

provided by Mutual.[3] (Def.'s Resp. to Pl.'s SOF ¶ 58.) *See generally* Log of Privileged Documents from Mutual Production ("Mutual Privilege Log") (Kelly Aff., Ex. 1). The first entries date from March 2005 and document multiple instances of communication between Mr. Schaefer of Mutual, the Herald, Mr. Sanford, and others regarding topics including "appeal" and "research." (Def.'s Resp. to Pl.'s SOF ¶ 58 (listing five privilege log entries from March 2005).) These entries are consistent with Mutual's version of the facts, as Mutual concedes that it was involved in discussions with both the Herald and the law firm regarding the likely success of an appeal in the months following the jury verdict (issued in February 2005). Next there are two entries from early November 2005. The first, dated November 8, 2005, documents communications between Mutual (Schaefer), an individual at the Herald (Magram), and Mr. Sanford regarding the "appeal." (Mutual Privilege Log, MUT0002003.) The second November 2005 entry cited by Murphy references an email stream regarding "appeal" on November 8–9, 2005. (Mutual Privilege Log, MUT001999–MUT002000.) These emails are also consistent with Mutual's narrative, as November 8, 2005 is the date Mutual claims Mr. Sanford issued his evaluation of the appeal and his firm's representation of Mutual ended. None of these emails creates a disputed issue of fact with respect to control of defense or settlement.

Finally, Murphy points to several additional entries, each entered after November 8, 2005, as support for his contention

---

**3.** Murphy also sought to offer the privilege logs of the Herald as evidence supporting his contention that Mutual controlled the defense. However, unlike the privilege logs of Mutual, which can be deemed an admission of a party opponent, there is no ground for considering the logs of the Herald as evidence. *See SEC v. Ficken*, 546 F.3d 45, 53 (1st Cir.2008)

("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.") (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The parties do not challenge the underlying assertions of privilege, previously addressed by this Court and Magistrate Judge Sorokin.

that Mutual assumed control of the defense after Mutual claims the period of joint representation had ended. First is an entry recording Mutual's receipt of a letter from Mr. Sanford, dated November 18, 2005, regarding "Appellate Strategy and Budget." (Mutual Privilege Log, MUT0001979–MUT0001981.) There are also multiple entries from the same mid-November period documenting email streams which included Mr. Schaefer of Mutual and discussed the filing of a notice of appeal. (Mutual Privilege Log, MUT001988–MUT001989 (dated November 14, 2005); MUT001997–MUT001998 (dated November 9, 2005).) Then, in the summer and fall of 2006, there are multiple email streams that include Mr. Schaefer and discuss the pending appeal, (*see, e.g.,* Mutual Privilege Log, MUT002418), followed by streams discussing the Massachusetts Supreme Judicial Court oral argument in January and February 2007. (*See, e.g.,* Mutual Privilege Log, MUT002316–MUT002317 (recording an email stream re: SJC oral argument dated January 26–28, 2007); MUT002303–MUT002304 (recording an email stream re: Appeal dated February 27–28, 2007).) In addition, Murphy emphasizes that there was extensive communication between Mutual, its own counsel, and the Herald's appellate counsel regarding settlement in May 2007 (around the time of the SJC's decision), and that these communications were not relayed in writing to the Herald or the Herald's general counsel (Brown Rudnick). (Def.'s Resp. to Pl.'s SOF ¶ 88.) Murphy contends that these May 2007 communications indicate that Mutual controlled the settlement process, to the exclusion of the Herald.

These privilege log entries do support the drawing of reasonable inferences that Mutual retained some association with the case even after the joint representation

ended. For example, an inference that Mutual was, as required under the Policy, kept advised of the appeal's progress is certainly reasonable. So too is an inference that, at least in May 2007, Mutual was actively thinking about the possibility of settlement. Yet even if Mutual had been involved in discussions about possible settlement with its counsel and/or the Herald's appellate counsel, that alone would not suffice to demonstrate that Mutual had assumed control. *See Morrison,* 441 Mass. at 455, 806 N.E.2d 388; *Rhodes,* 2008 WL 2357015, at *21. Where, as here, "the insured has retained independent counsel, an insurer's participation in settlement negotiations does not itself constitute an assumption of the insured's defense." *Nat'l Union Fire Ins. Co. of Pittsburgh v. CNA Ins. Cos.,* 28 F.3d 29, 33 (5th Cir. 1994) (concluding, on summary judgment, that evidence demonstrating that the insurer's adjuster participated in settlement negotiations with the plaintiffs was insufficient to raise a material issue of fact as to whether the insurer "actually controlled the defense of the litigation"). As even Murphy concedes, Mutual has no duty to settle with Judge Murphy if it demonstrates "that [Mutual's] conduct only amounted to participation in settlement negotiations rather than control." (Def.'s Mem. in Opp'n 14) (quoting *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.,* No. 3:04–cv–1866–D, 2007 WL 2403656, *5 (N.D.Tex. Aug. 23, 2007).)

When all reasonable inferences are drawn in Murphy's favor, at best there is evidence that Mutual exercised its right to associate during the appeal. There is not, however, sufficient evidence on this record to support a reasonable inference that Mutual ever exclusively controlled the defense, the appeal, or the settlement. The privilege log entries, without more, do not create a genuine issue of material fact in light of the sworn testimony of the wit-

nesses from the Herald and Mutual that the Herald never approved settlement, and that it retained complete control over settlement even during the appeal period. In these circumstances, nothing in the Policy gives Mutual the right to settle without the Herald's agreement.

Accordingly, I conclude, as a matter of law, that, because Mutual did not exercise exclusive control over the defense or settlement of the claim and the Herald never agreed to settle, Mutual did not have a duty to "effectuate prompt, fair, and equitable settlement" under Massachusetts law. Mass. Gen. Laws ch. 176D § 3(9)(f).

### IV.  *ORDER*

Plaintiff's motion for summary judgment [Docket No. 42] on Count I of its Complaint seeking a Declaratory Judgment and on Defendant Murphy's counterclaim is ***ALLOWED.*** Counts II through IV of Plaintiff's complaint are dismissed without prejudice.