NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-567                                            Appeals Court

    ROLAND VAN LIEW vs.  PHILIP ELIOPOULOS; HANDS ON TECHNOLOGY
           TRANSFER, INC., third-party defendant.


                         No. 16-P-567.

     Middlesex.      January 5, 2017. - August 25, 2017.

            Present:  Green, Meade, & Blake, JJ.


Libel and Slander.  Constitutional Law, Libel and slander.
     Damages, Libel, Emotional distress, Remittitur.  State
     Ethics Commission.  Conflict of Interest.  Emotional
     Distress.  Practice, Civil, Judicial discretion,
     Instructions to jury.




     Civil action commenced in the Superior Court Department on
January 3, 2011.

     The case was tried before Kenneth V. Desmond, Jr., J., and
a motion for a new trial or in the alternative for remittitur
was heard by him.


     Brian C. Newberry for Roland Van Liew & another.
     David H. Rich for the defendant.


     BLAKE, J.  In 2010, a bitter feud erupted between

Chelmsford residents Roland Van Liew and Philip Eliopoulos.  Van

Liew commenced the dispute by accusing Eliopoulos, a local

selectman, of shady political dealings in his work as a real estate attorney.  After Eliopoulos responded publicly to the allegations, Van Liew filed in Superior Court this defamation action against him.  Eliopoulos counterclaimed, alleging defamation on the part of Van Liew, and impleaded Van Liew's company, Hands on Technology Transfer, Inc. (collectively, Van Liew).  A jury subsequently found Van Liew liable for making twenty-nine defamatory statements, and awarded $2.9 million in damages.  They found no wrongdoing on the part of Eliopoulos. The judge denied Van Liew's posttrial motions on the counterclaim verdict,[1] and he now appeals,[2] challenging the proof of defamation on the twenty-nine statements.  He also claims that the judge committed evidentiary errors and that the excessive damages awarded require remittitur.  We affirm.

Background.  1.  Real estate development in Chelmsford.  In the summer of 2008, Chelmsford real estate broker and developer Michael Eliopoulos, Philip's[3] father, approached Eastern Bank about a historic home situated on a parcel of land it owned in

---

[1] Van Liew filed a panoply of posttrial motions, including, e.g., a motion for judgment notwithstanding the verdict, a motion to alter or amend the judgment, and a motion for a new trial or for remittitur.

[2] Van Liew does not appeal from the adverse jury verdict on his defamation claims against Eliopoulos.

[3] We henceforth refer to members of the Eliopoulos family by their first names to avoid confusion.

Chelmsford center. Michael then negotiated the sale of an undeveloped portion of the property with Thomas Dunn, an employee of Eastern Bank. The purchase price was $480,000. Philip and his law firm reviewed draft agreements and served as real estate counsel. The sale closed on June 17, 2009, after which the 2.41-acre property became known as 9 North Street (the property).[4] During the real estate negotiations, until April of 2009, when his term expired, Philip was a member of the board of selectmen (board) of Chelmsford. He attended his final meeting on March 23, 2009.

In 2007, prior to Michael's offer to purchase the property, the Chelmsford fire department and department of public works facility study committee (the committee) was considering options for a new fire station headquarters. One option was rebuilding and expanding the Chelmsford center fire station, which was located on Chelmsford-owned land adjacent to the property. On August 7, 2007, the committee voted to narrow their primary and alternative site selections to two choices, neither of which was the center fire station or the property. Accordingly, Philip and the other members of the board understood that, as of September of 2007, the committee no longer was interested in the

---

[4] The original five-acre commercial property contained a bank branch building and abutted the Chelmsford fire department headquarters known as the Chelmsford center fire station.

possible purchase of the property.  Ultimately, the committee identified a location on Wilson Street for a new fire department headquarters.[5]

Beginning in April, 2009, after the expiration of his board term, Philip assisted Michael in his development of the property.  The plan called for the rehabilitation of the historic house, and the construction of a new four-unit, family-owned office building.  During the nine-month permitting process, Philip represented Michael's newly formed corporation, Epsilon Group, LLC (Epsilon).  After a series of public hearings and changes to the plan, a number of local boards and committees approved the project, including the historic district commission, the conservation commission, and the planning board of Chelmsford.  On August 23, 2010, the board determined that

---

[5] For the sake of completeness, we note that the October, 2008, committee minutes show that the committee had not officially eliminated the possibility of using the property for the new fire station headquarters.  Paul Cohen, the Chelmsford town manager, approached Dunn in February, 2009, to see if he was interested in subdividing and selling the Eastern Bank property for this purpose.  At that point, Michael and Eastern Bank already had executed an offer to purchase the property. Cohen mentioned the matter to the members of the board at a March 16, 2009, work session after Philip had left.  Philip knew nothing about Chelmsford's continued interest in the property until the March 23, 2009, board meeting, when a committee member suggested that, regardless of the fire station location, Chelmsford should purchase the land behind the center fire station to enhance the value of that Chelmsford-owned asset.  At that same meeting, the committee recommended the Wilson Street site for the future fire station headquarters.

the project did not violate a historic preservation restriction (restriction) that encumbered the property.  Scrutiny of the project was careful and deliberate due to the prominence of the Eliopoulos family in Chelmsford, as well as the vocal opposition to the project.

2.  Feud begins.  Van Liew, a successful local business owner, was one of the vocal opponents of the project.  Commencing in early 2010, Van Liew, through several organizations controlled by him,[6] widely published statements criticizing Philip for engaging in self-dealing and conflicts of interest at the expense of Chelmsford.  He flooded Chelmsford residents with his messaging, accusing Philip and other Chelmsford officials of violating State and local ethics laws and of violating the restriction.  The publications conjured up unsavory images of shady "back room" dealing at Chelmsford town hall, influence peddling, and fixed governmental proceedings.  Van Liew's statements were published and repeated across a variety of media outlets:  mass electronic mail messages (e-mails), letters, a digital video disc (DVD) sent to thousands of Chelmsford residents, Web site postings, a glossy newsletter entitled "Why Perjury Matters," lawn signs, bumper stickers,

_____

[6] Organizations funded and controlled by Van Liew included the Slow Growth Initiative, the Better Not Bigger Coalition, and Cheating Chelmsford.

letters to newspapers, automated telephone calls, and video recordings of conferences and meetings.  Van Liew spent between $1 and $2 million to spread his messaging.  In early August, 2010, Philip attempted to defend himself in an open letter sent to every Chelmsford resident, at his own expense.[7]

3.  No wrongdoing found by State agencies.  In late 2009, Philip voluntarily subjected himself to an investigation by the State Ethics Commission (commission).  Notwithstanding the multiple complaints lodged against him by Van Liew and his associates, the commission did not pursue enforcement proceedings against Philip, and closed the case on December 1, 2011.  A similar investigation of the Chelmsford town manager, Paul Cohen, reached the same result.  Likewise, the Board of Bar Overseers (BBO) took no action in response to Van Liew's complaints to that agency.  The office of the Attorney General also declined to investigate Philip.  No finding ever was made that the permitting process or the project was illegal or violated the restriction.

4.  Present action.  On January 3, 2011, Van Liew filed the present action, with Philip's counterclaim following shortly

---

[7] After the August, 2010, board vote on the restriction issue, Van Liew also organized a campaign to recall the selectmen who had voted in favor of the project.  In the summer of 2011, the recall effort failed, as did final attempts to block the development through various court actions.

thereafter.  Over the course of seventeen days in February and March, 2015, the case was tried to a jury.  At the close of the case, the jury were given a special verdict form, which properly defined the requirements of defamation involving a public official and, as to the counterclaim, asked whether Philip had proven all of the required elements of his claims on each of thirty-nine statements.[8]  The jury awarded $2.9 million in damages to Philip on twenty-nine of those statements.  Van Liew moved for judgment notwithstanding the verdict and a new trial on the counterclaim verdict and a remittitur on the damages award,[9] claiming that the judge had hampered his ability to present his case and improperly admitted prejudicial evidence, the proof of defamation was legally insufficient, and the damages awarded were excessive.  The judge denied all of the posttrial motions, and Van Liew now raises the same claims on appeal.  Further facts, including the defamatory statements at issue, will be set forth infra.

---

[8] The verdict form was consistent with a pretrial order limiting the scope of Philip's counterclaim.  As extensive as this body of libel was, it represented only the tip of the iceberg.  Forty-nine different publications containing ninety-five additional defamatory statements were collected in one exhibit and admitted (with a proper limiting instruction) to show Van Liew's state of mind.

[9] See footnote 1, supra.

Discussion. 1. Evidentiary claims. Due to concerns over the length of the trial, the judge imposed a preliminary time limit on Van Liew's case-in-chief, which the judge extended several times.[10] Van Liew nevertheless challenges the time limits placed on his case-in-chief. There was no abuse of discretion, considering Van Liew's severe underestimation of the time required to examine his witnesses, and juror concern over the length of the trial.[11] See Clark v. Clark, 47 Mass. App. Ct. 737, 746 (1999) ("A judge, as the guiding spirit and controlling mind of the trial, should be able to set reasonable limits on the length of a trial. This includes the right to set reasonable limits on the length of the direct and cross-examination of witnesses").

Van Liew also maintains that the following evidence should have been excluded as unduly prejudicial: (1) evidence related to his arrest and prosecution for attempting to poison his neighbor's dog; (2) evidence related to commission enforcement

_____

[10] The length of Van Liew's direct testimony fell within the range of the estimate given by his attorney.

[11] Notwithstanding Van Liew's estimate that his case-in-chief would take six or seven days, the testimony of his first witness, i.e., Philip, extended more than eight days. Van Liew's attorney also informed the judge that he planned to call "approximately" six more witnesses after Van Liew testified. Van Liew was not precluded from calling any witnesses. In addition, two jurors sent notes to the judge expressing concerns about the length of the trial.

proceedings against one of his attorneys, Richard McClure; and (3) references to his anti-Vatican and population control opinions.

As to the dog incident, the evidence provided a cause of Van Liew's claimed emotional distress other than Philip's statements.[12]  Van Liew also opened the door to impeachment by testifying that he was perceived as a "good neighbor."  See Mass. G. Evid. § 608 (2017).  The evidence about McClure likewise was not substantially more prejudicial than probative. See Mass. G. Evid. § 403 (2017).  Even after the commission closed the case on Philip, Van Liew continued to publish statements about Philip's ethical violations based in part on McClure's legal advice.  The commission investigation of McClure was probative of Van Liew's recklessness in continuing to rely on McClure's opinion, even after learning of the commission charges against him.[13]  See Murphy v. Boston Herald, Inc., 449 Mass. 42, 49 (2007), citing St. Amant v. Thompson, 390 U.S. 727,

---

[12] Chelmsford residents learned of the incident through mass mailing and published report.

[13] The commission found reasonable cause to believe that McClure had repeatedly violated G. L. c. 268A, § 17(c), the State ethics statute regarding conflicts of interest, and authorized the initiation of an adjudicatory proceeding against him.  The nature of the violations stemmed from McClure's representation of individuals in multiple actions against the town of Chelmsford while simultaneously serving as a member of the planning board of Chelmsford, thus creating conflicts of interest.

730-732 (1968) (discussing reckless reliance on third-party opinion in defamation case). In each instance, the judge also gave limiting instructions on the proper use of the evidence to the jury, who were presumed to have followed these instructions. See Gath v. M/A-Com, Inc., 440 Mass. 482, 493 (2003).

Finally, Van Liew did not preserve his objection to the introduction of evidence about his opinions on the Vatican and population control.[14] Van Liew's motion in limine to exclude all such evidence initially was allowed. The bases for the motion were relevancy and that any probative value was outweighed by the danger of unfair prejudice. Thereafter, Philip sought to introduce the document contending that Van Liew opened the door to the admission of the evidence. Van Liew's counsel objected on the basis of "foundation, relevance, hearsay," which the judge overruled. Counsel's objection on the basis of prejudice the following day was untimely. See Matsuyama v. Birnbaum, 452

---

[14] Van Liew sought to exclude from evidence a narrative and a time line circulated in Chelmsford by a group opposing the recall of individuals on the board. The fourteen-page document contains a reference to a 1992 article written by Van Liew for the Center for Research on Population Security in which he criticized the "Vatican power politics [that] threaten the reproductive rights of non-adherents." The jury were not provided with a copy of the article.

Mass. 1, 35 (2008).  Even if the issue had been preserved, we agree that Van Liew also opened the door to this evidence.[15]

2. Proof of defamation.  a. Elements and standard of review.  To prove defamation, a plaintiff must establish that "the defendant was at fault for the publication of a false statement . . . regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss."  White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66 (2004), citing Ravnikar v. Bogojavlensky, 438 Mass. 627, 629-630 (2003).  See Edwards v. Commonwealth, 477 Mass. 254, 262-263 (2017).  If a challenged statement is plainly an opinion or subjective view, rather than a statement of fact, it is not actionable as a matter of law.  Scholz v. Delp, 473 Mass. 242, 251 (2015).  "In determining whether an assertion is a statement of fact or opinion, 'the test to be applied . . . requires that the court examine the statement in its totality in the context in which it was uttered or published.  The court must consider all the words used, not merely a particular phrase or sentence.

_____

[15] Van Liew's attorneys tried unsuccessfully to tie Philip to the creation of an anti-recall document containing Van Liew's controversial opinions.  See note 14, supra.  Van Liew testified that the document was defamatory and negatively affected his reputation.  The jury learned about the subject matter of the article only after Van Liew unexpectedly denied that his article and his views were controversial.

In addition, the court must give weight to cautionary terms used by the person publishing the statement.  Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.'"  Downey v. Chutehall Constr. Co., 86 Mass. App. Ct. 660, 663-664 (2014), quoting from Cole v. Westinghouse Bdcst. Co., 386 Mass. 303, 309, cert. denied, 459 U.S. 1037 (1982).[16]

Because it is undisputed that Philip was a public official at the time the statements were made,[17] in addition to proving the common-law elements of defamation, Federal constitutional law also requires that he prove, by clear and convincing evidence, that Van Liew published the statements with actual malice.  See New York Times Co. v. Sullivan, 376 U.S. 254, 279-

---

[16] We summarily reject Van Liew's argument that he did not publish the statements at issue.  There is ample evidence from which the jury could have found that he created and funded the organizations that dispersed his statements, and that he personally signed twenty of them.  To the extent that Van Liew maintains that many of the statements were vetted by Spencer Kimball, his so-called "expert" on the First Amendment to the United States Constitution, the verdict makes clear that the jury did not credit Kimball's limited substantive testimony. See Murphy, 449 Mass. at 55 (jury's credibility assessments entitled to deference on appeal).

[17] Philip served on the board from 1997 to 2009. Thereafter, he served as a representative town meeting member. See Lane v. MPG Newspapers, 438 Mass. 476, 482-483 (2003). Philip also has served as a member of Chelmsford's master planning committee and the community preservation board.

280 (1964); King v. Globe Newspaper Co., 400 Mass. 705, 719 (1987), cert. denied, 485 U.S. 962 (1988).

In Murphy, 449 Mass. at 48, the Supreme Judicial Court set out the constitutional principles involved in a defamation case implicating a public official:

> "The First Amendment to the United States Constitution sets clear limits on the application of defamation law with respect to any factual statement published in the news media about a public official or public figure, . . . even when that statement is shown to be false and defamatory. In [New York Times Co., 376 U.S. at 279-280], the United States Supreme Court held that, in such cases, the First Amendment requires that the plaintiff must prove, by clear and convincing evidence, that the defendant published the false and defamatory material with '"actual malice" --that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'"

A finding of "reckless disregard" requires proof that the publisher acted with a "high degree of awareness of [its] probable falsity" or, in other words, "entertained serious doubts as to the truth of his publication." Murphy, supra at 43, 48 (citation omitted). An inference of actual malice may be drawn from circumstantial evidence. Id. at 57-58.

An appellate court, when faced with a defamation case, must independently review the record as to each defamatory statement to make certain that it supports the jury's finding of actual malice. Id. at 49, citing Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 514 & n.31 (1984). In doing so, the court must defer to the jury's assessments of credibility and

demeanor.  Id. at 50.  "The constitutionally required independent examination therefore takes place when, after compiling all of the facts implicitly established by the jury's verdict, the court considers whether that body of facts, clearly and convincingly, supports a determination of actual malice."  Ibid.

b.  Analysis of statements at issue.  Having set forth the proper legal framework, we turn now to the twenty-nine statements the jury found to be defamatory.  Without reproducing each statement, many of which are repetitive, we have grouped the statements by thematic category, providing typical examples.  Within those categories, we assess first whether the statements are defamatory (reserving for later discussion economic harm to Philip's reputation) and, second, whether the record supports a finding of actual malice.

i.  Ethics related to purchase of the property.  More than one-half of the twenty-nine statements implicate Philip's personal integrity and the legality of his behavior with respect to the purchase of the property.  Five statements say that he lied, either to public officials or to investigators, e.g., "Not a single selectman has acknowledged the fact that . . . Phil Eliopoulos has also lied to them, at multiple meetings and public hearings."  Thirteen statements maintain that Philip's acts, or the related acts of other officials, constituted

illegal State ethics violations, e.g., "It's not an 'opinion' that Phil Eliopoulos represented his father's LLC in violation of Massachusetts ethics laws, it's a documented fact." Finally, three statements contain variations of Van Liew's contention that Philip and Chelmsford officials then covered up those violations. For example, "Nor did [town manager Cohen] report Phil Eliopoulos' obvious ethics violations to the State Ethics Commission as required under the Chelmsford bylaws."

While many of these statements contain some amount of opinion, they are false and defamatory where they refer to lies, back room deals, conflicts of interest, illegal behavior, and cover-ups as fact.[18,19] No evidence was ever uncovered supporting Van Liew's allegations of back room dealings, illegality, or graft. The commission investigations of Philip and Cohen, which encompassed Philip's interactions with Chelmsford during the

---

[18] For example, the statement that Philip "used his position and influence" to deter Chelmsford from buying a parcel of land was one of fact, and not opinion, particularly where the issue was never before the board when Philip was a member, and the statement was made in a video recording containing a number of false statements about the "illegal" project and back room deals.

[19] The statements also concerned Philip, even where they referred to the bad acts of others as well. In particular, contrary to Van Liew's suggestion, the statement referring to "multiple public officials" unlawfully abetting Philip's unethical conduct and conflicts of interest "concerned" Philip and thus was defamatory to him as well as to others. See HipSaver, Inc. v. Kiel, 464 Mass. 517, 528 (2013).

negotiation and the purchase of the property, both resulted in no action taken. In short, Philip was never charged or found to have committed an ethics violation. Where there was no violation, neither could there have been a cover-up or a failure to report.

The jury also had reason to find actual malice. At the time the statements were made, Van Liew knew that the commission had reviewed Philip's representation of Michael and Epsilon, and that the commission had issued a letter stating that it is "satisfied that this matter does not require any further action on [its] part." Van Liew also admitted that he had no knowledge of what Philip told investigators. In contrast, Philip described for the jury both the first and the second commission investigations, and listed the documents he had provided to the commission. Van Liew also knew from Dunn's deposition that the sale was not a result of some back room deal. Rather, Eastern Bank was simply not willing to subdivide the parcel of land in which Chelmsford was interested, and had decided to sell to the safer purchaser whose offer was not contingent on town meeting and resident approval. Van Liew also was unable to explain how he had "connected the dots" on the graft allegations. Finally, Van Liew knew that a Land Court judge had reached the same conclusion as the commission, i.e., that there had been no

wrongdoing.[20]  On the basis of this substantial body of evidence, the jury could have concluded that Van Liew issued the statements recklessly, with a high degree of awareness of their probable falsity.

On appeal, Van Liew argues that he consulted the ethics statute before making the statements.  The claim does not preclude a finding of actual malice, especially where he knew that the governing body charged with enforcing the ethics statute, i.e., the commission, had not taken any action against Philip.  The jury had the statutory provisions before them, and could have concluded there were no violations.  In a similar vein, the jury also could have found that Van Liew's continuing reliance on the opinion of Spencer Kimball (Van Liew's "First Amendment expert") after late 2011, when the commission closed the investigation, was not reasonable.

ii.  <u>Voting record</u>.  Van Liew stated many times that while Philip was a member of the board, he voted in March of 2009 against Chelmsford purchasing the property.  The following is a typical example:  "Eliopoulos was simultaneously serving as the

---

[20] The Land Court judge denied the property abutters' motion for a preliminary injunction, which was known to Van Liew.  In his decision, the judge opined that "the decisions of the [planning board of Chelmsford] granting these [site and special permit] approvals do not appear to have been unlawful, arbitrary, or capricious" and allowed them to stand.

Chairman of the [board] and voted against [Chelmsford] purchasing [the property]."

The evidence establishes that the statements were patently false.  Neither Philip nor the board voted against Chelmsford purchasing the property on March 23, 2009, or at any other time.  The jury had copies of the board meeting minutes and a video recording of the board meeting in question to verify that Philip did not vote in the manner attributed to him.  Because the false statements suggest that Philip used his position as a member of the board to advance his family's interests at the expense of Chelmsford, the jury also were warranted in concluding that they were defamatory.  See King, 400 Mass. at 717-718.[21]

A finding of actual malice was equally supported.  In his testimony, Van Liew admitted that he had possession of the board minutes and had watched the video recording many times before making and repeating the false statement about the board vote.[22]

---

[21] The statement, "Also, it's a very good bet that Phil Eliopoulos didn't provide [the commission] documents showing he voted against [Chelmsford] purchasing the land" is defamatory, rather than pure opinion as Van Liew suggests, because it implies the existence of undisclosed defamatory facts.  See King, supra at 713.  Likewise, casting the same false and defamatory statement of fact as a rhetorical question does not provide a safe harbor from liability.

[22] In one statement, Van Liew even said that the vote "is not 'opinion' or 'conjecture,' it's recorded in meeting minutes and on video," despite his knowledge to the contrary.

The jury accordingly could have found that he knew the statements were false when he made them.

iii. <u>Investigation</u>. Van Liew twice stated that Philip was under investigation, e.g., "Cohen, Eliopoulos Under Investigation. . . . [T]he Attorney General's office is now focusing on the town of Chelmsford and in particular the former selectman Phil Eliopoulos."

The evidence presented supports a finding of both defamation and actual malice. As to the former, after the above statement circulated, both Philip and Cohen learned from the office of the Attorney General that there was no investigation, let alone a focus on Philip. The actual malice standard is met because Van Liew knew the statement was false. He stated, in another publication, that the office of the Attorney General would not accept his complaint about Philip because it had no jurisdiction. Van Liew also received a letter from the office of the Attorney General stating, as he said, that the ethics issues "belonged with the [commission]."[23],[24]

---

[23] To the extent that Van Liew argues that he had no actual malice because he had the statement taken down from a Web site after learning of his mistake, Kimball testified that Van Liew asked him to take the statement down not for any inaccuracy, but because it was taking them "off-message."

[24] The other statement that Philip was under investigation, i.e., "[M]ajor state ethics charges against Eliopoulos still stand," is also defamatory, and a finding of actual malice supported because, as discussed, Van Liew knew when he made the

iv.  _Statements attributed to Dunn_.  In a mailing to Chelmsford residents, Van Liew stated:  "It turns out that the situation is worse than anyone imagined.  Eastern Bank personnel have now indicated that Cohen in 2009 was offered the land for [Chelmsford] at no cost -- that's right, for free."

At trial, Dunn, who was responsible for the sale of the property, confirmed this was a false statement.  He denied that he had ever made such an offer, and testified that he had not discussed tax consequences of a possible land donation with Chelmsford officials.[25]  As for actual malice, Craig Chemaly, the director at the time of Van Liew's Slow Growth Initiative, testified that Dunn told Chemaly about the free offer and that he relayed this information to Van Liew.  The jury were free, however, to discredit this version of events, which formed Van Liew's professed good faith basis for making the false statement.[26]  In any event, even if Van Liew did not learn that there was no "free" offer until after he had already made the statement, he repeated the false statement on many subsequent

statement that no ethics charges were ever brought by any administrative, municipal, or governmental body.

[25] Dunn's earlier January, 2011, deposition testimony is consistent with his trial testimony.

[26] Van Liew also admitted that he never telephoned Dunn to ask questions about the free offer before publishing this statement.

occasions, i.e., after Dunn denied making the free land offer during his deposition.[27]

v. Permitting process and the restriction. In a mailing to Chelmsford residents, Van Liew stated: "The permitting process was fraudulent, as Phil Eliopoulos unlawfully represented Epsilon Group, LLC before town boards. Epsilon's building clearly violates MULTIPLE provisions of the preservation restrictions." In an e-mail and Web site posting, Van Liew made similar statements.

Again, the statements are false and defamatory. When Van Liew published these statements, several Chelmsford boards and commissions had already approved the project. Those involved in the actual permitting process also testified unanimously to the absence of facts tending to show that Philip had committed any illegal, corrupt, or unethical acts. In particular, a former member of the planning board of Chelmsford testified that, from a zoning perspective, the permitting process was followed to a "T." Likewise, two different law firms asked to render legal opinions concluded that the restriction did not bar all future

---

[27] Another statement, claiming that Dunn's deposition "shows that Phil Eliopoulos and Paul Cohen have both lied about what they did, what they knew" fares no better, where Dunn's deposition contradicts the statement, Dunn's testimony was substantially consistent with Philip's and Cohen's, and Van Liew had Dunn's deposition testimony at the time he made the statement.

development, an interpretation confirmed by the Land Court judge.[28]  Moreover, two lawsuits challenging the project's compliance with the restriction and the legality of the process ended unfavorably to the challengers.  A third lawsuit challenging the project was dismissed.  Van Liew admitted that no court ever found that the project violated the restriction.  Finally, as for the allegation that Philip "unlawfully" represented Epsilon, it had been expressly brought before the commission, which did not pursue charges.[29]  On the basis of this evidence, the jury could have concluded that the project did not violate the preservation restriction, and the permitting process was neither fraudulent nor unlawful.  See Downey, 86 Mass. App. Ct. at 664 ("[I]n contrast to statements of opinion, statements

---

[28] In a second decision, dated July 28, 2011, the same Land Court judge who earlier had denied relief to the abutters, dismissed an action filed by Van Liew's attorney, McClure, for failure to state a claim.  In dicta, the judge found that the allegations about violations of the restriction were without merit, the board committed no error in its vote concerning the restriction, and the planning board of Chelmsford lacked the authority to deny the approval of the site plan "so as to prevent the project from going forward altogether."  Incredibly, Van Liew testified that these Land Court decisions supported his statements about the fraudulent process and the violations of the restriction.

[29] To the extent that Van Liew argues that the statement does not concern Philip, he was inferentially included as part of the so-called "Eliopoulos consortium."  Moreover, after Michael became ill with cancer, Philip stood in for him part time during the construction process.

that present or imply the existence of facts that can be proven true or false are actionable").

As for actual malice, at the time he published these statements, Van Liew had read the legal opinions, the two commission decisions, and the judicial decisions. The public hearings held during the permitting process also were available for viewing. While Van Liew testified that he relied on the opinion of John Carson, a former member of the board, the jury well could have disregarded Carson's opinion as incorrect or irrelevant, and Van Liew's reliance as misguided, based on the evidence.[30] In sum, given the state of the evidence and Van Liew's knowledge at the time, the actual malice standard was met.

vi. <u>Nonactionable opinion</u>. Of the twenty-nine statements the jury found defamatory, upon a generous review, we conclude that three arguably do not pass evidentiary muster, as they express nonactionable opinion.[31] These three opinion statements

---

[30] Van Liew neither appeared at any of the public hearings, nor submitted questions, evidence demonstrating reckless disregard for the truth of his statements. Van Liew also declined Philip's many offers to debate him publicly on these issues to "resolve the truth of these matters," opting instead to issue the defamatory publications.

[31] The three statements are:

"In Chelmsford, proponents of the recall have provided evidence that former selectman Phil Eliopoulos used his position and influence to keep town officials in the dark

are similar in content and theme to the remaining twenty-six defamatory statements. They do not add measurably to Eliopoulos's injury and, as detailed infra, the damages are supported by the evidence. Indeed, the twenty-six defamatory statements were published hundreds of times in multiple platforms over a five-year period. Van Liew's defamation campaign was unrelenting and the conclusion that three of the statements were not actionable does not alter the result.[32]

3. Damages. The special verdict form directed the jury to consider three categories of damages if they found that Philip suffered harm as a result of the defamatory statements. The

---

while assisting his family to purchase land behind the Center Fire Station that was of interest to the town both as recreational space and to provide an area for low cost improvements to the fire station. After resigning as a selectman at the end of his term, he subsequently represented his family's development corporation before town boards . . . , an apparent violation of state ethics laws."

"It's clear even from the evidence already in our possession that Mr. Cohen and Mr. Eliopoulos acted improperly, the sale of '[the property]' to the Eliopoulos family can be voided."

"The research by me and others into ethics violations by Phil Eliopoulos and Paul Cohen has proven disturbingly fruitful and has made it clear that Chelmsford town officials simply don't care to uphold the law . . . . We're not asking for the moon. We want the lying by Cohen and Eliopoulos and other officials to stop. We want the law upheld."

[32] The jury considered thirty nine statements in total and found ten were not defamatory.

jury awarded reputational damages of $2.5 million, emotional distress damages of $250,000, and compensatory damages of $150,000. On appeal, Van Liew challenges only the reputational and emotional distress damages awarded, arguing that they are not grounded in evidence, but instead are "the product of an inflamed and punitive jury."

"A plaintiff in a successful defamation case is entitled . . . to fair compensation for actual damages, including emotional distress and harm to reputation (and any special damages that have been pleaded and proved)." Murphy, 449 Mass. at 67, quoting from Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 404-405, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546 U.S. 927 (2005). "Punitive damages are prohibited, . . . even on proof of actual malice." Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 861 (1975). Generally, "a reviewing court should not disturb a jury's award of damages unless it is clearly excessive" relative to the plaintiff's evidence of damages, also keeping in mind "that appellate judges have a special duty in reviewing verdicts in defamation cases, '[b]ecause of constitutional considerations, and the potential difficulties in assessing fair compensation.'" Ayash, supra at 404, quoting from Stone, supra. We conclude that in light of the ample evidence of substantial harm suffered by Philip, even factoring in the three nonactionable statements, the jury's

award was neither punitive, disproportionate to the injuries proven, nor excessive.

First, the damages awarded were not punitive, as the judge properly instructed the jury, consistent with the case law and the Superior Court model jury instructions, that punitive damages are not permitted in a defamation action. See, e.g., Massachusetts Superior Court Civil Practice Jury Instructions 6.4.1 (3d ed. 2014). The jury are presumed to have followed these instructions. See Reckis v. Johnson & Johnson, 471 Mass. 272, 304 n.49 (2015), citing O'Connor v. Raymark Indus., 401 Mass. 586, 590 (1988). We next turn to the specific awards challenged.

a. Reputational damages. The principal question for the jury was the value of Philip's destroyed reputation. The evidence established that he is a lifelong resident of Chelmsford and, before Van Liew's actions, had a stellar reputation as a hard-working, well-respected, and honest public servant. Apart from his time as a member of the board, for several years he also served as a representative town meeting member for his precinct. Philip testified that his reputation and his good family name have always been important to him.[33]

---

[33] Philip explained that when he held up a sign during his first campaign for the board, voters came up to him and said, "I don't know who you are, but I know who your father is; I know

The jury could have found, based on the evidence and testimony presented, that the defamation had a devastating and continuing impact on that stellar personal and professional reputation. Matthew Hanson, a member of the board and a real estate broker, testified that potential real estate buyers and sellers do not want to work with Philip because "a lot of folks think that he is a -- a corrupt, unethical person, because it's been said hundreds . . . of times, over the past few years, in mailings and e-mails to their homes."[34] Hanson had a good sense of Chelmsford residents' opinion of Philip, as Van Liew's mailings were the topic of hundreds of conversations Hanson had with his constituents over the years. He testified that, as of the date of trial, they were still discussing with him how they were upset with Philip about the property.

Dennis Ready, another real estate broker and a member of a committee opposing Van Liew's recall campaign, see note 7, supra, testified that as part of his committee work he made hundreds of telephone calls to Chelmsford residents. During those calls, he learned that residents were angry at Philip and

who your uncle is; I know your reputation. And you've got my support."

[34] Philip counted 125 "lies and misinformation" about him in Van Liew's mailings. The jury had before it one such mailing, the glossy magazine-like publication entitled "Why Perjury Matters," mailed to every Chelmsford household, which republished many earlier defamatory statements.

viewed him as an "unethical" individual who had used a "loophole" to steal land from Chelmsford.  Ready testified that his real estate clients would not take his recommendation to use Philip as their attorney and that other brokers in his office had similar experiences.

Philip also testified that local realtors had tried to refer their clients to his firm, but were unsuccessful due to his negative reputation in the community.  As he put it, "Who's going to want to do business with an attorney who they're reading is being 'investigated' by the Attorney General?" Philip also testified that he received anonymous hate mail stating that the writer would never do business with Philip's law firm.

The effect of Van Liew's defamation was pervasive and long-reaching.  Some of the statements were republished by regional newspapers such as the Lowell Sun, which has thousands of print and online readers.  Pasquale Russo, a financial planner, testified that when certain residents of a Chelmsford condominium complex learned of Philip's involvement in a retirement seminar planned for May, 2014, they refused to allow the event to be held on the premises.  Neither did the statements stop after Van Liew filed the within lawsuit.  Philip testified that Van Liew had sent out a mailing about the "illegal 9 North Road project" as recently as a couple of weeks

before the trial.  Philip also testified that he had recently searched his name on the Internet, the results of which included several of Van Liew's defamatory statements.

b.  Emotional distress damages.  The jury heard evidence about Philip's "[p]retty awful" feelings, embarrassment, and humiliation at the lies published about him, as well as evidence about his feelings of helplessness caused by his financial inability to defend himself from Van Liew's continuing attacks. Philip testified that he has woken up in the middle of the night, thinking about the defamation.  He spends time anticipating the next mailing and dreads going to the mailbox each day, wondering what new lies from Van Liew await.  The defamation campaign also curtailed his social life, as Philip described that he has stopped going to community events and Chelmsford celebrations and eating out in restaurants because he "knew" that he would be the topic of others' conversations.  In addition, the jury heard evidence that Philip was personally hurt watching his family go through this ordeal, and watching his parents' pain and sadness at what was being said about him. Compare Murphy, 449 Mass. at 67 (jury could consider pain experienced by father watching his daughter suffer from defamation directed against him).

Based on this wealth of evidence, the damages awards were neither excessive nor disproportionate.  The jury well could

have found that the defamation turned Philip into a pariah in his own community, a status for him that has no end in sight. See, e.g., Ayash, 443 Mass. at 371, 406-408 (affirming $2.1 million defamation award, including emotional distress awards of $1,440,000 against newspaper and $360,000 against reporter); Borne v. Haverhill Golf & Country Club, Inc., 58 Mass. App. Ct. 306, 319-321 (2003) (concluding $424,000 emotional distress award not excessive).

Judgment affirmed.

Orders on posttrial motions
    affirmed.